**UNITED STATES of America, Plaintiff,**

v.

**INTERMOUNTAIN REGION CONCRETE COMPANY, INC., and Cache Valley Bank, Defendants.**

**No. NC 84–0030J.**

United States District Court, D. Utah, N.D.

May 27, 1986.

Glen Dawson, Asst. U.S. Atty., Salt Lake City, Utah, for plaintiff.

N. George Daines, Logan, Utah, for defendants.

## AMENDED AND CORRECTED MEMORANDUM OPINION AND ORDER

JENKINS, Chief Judge.

This action was initially brought to enforce an Internal Revenue Service levy served on the defendant Cache Valley Bank as successor in interest to the North Park Bank of Commerce. The plaintiff filed an amended complaint seeking, under its second cause of action, to foreclose its tax liens against certain property of the defendant Intermountain Region Concrete Company then in possession of the defendant bank. The matter is now before the court on cross-motions for summary judgment on that second cause of action.

A hearing was held on August 21, 1985. Glen Dawson appeared on behalf of the plaintiff, and N. George Daines appeared on behalf of the defendant Cache Valley Bank. After hearing oral arguments, the court took the matter under advisement and requested that the parties furnish supplemental briefs on the narrow issue of the scope of the property to which the federal tax lien allegedly attached in this case. Now, having received and considered those supplemental memoranda and having reviewed the pertinent authorities, the court renders this memorandum opinion and order denying the plaintiff's motion for summary judgment and granting the defendant's cross-motion.

The facts are undisputed. The defendant Intermountain Region Concrete Company ("Intermountain" or "the taxpayer") was involuntarily dissolved on December 31, 1983. Prior to that time, the Internal Revenue Service made a series of tax assessments against Intermountain for unpaid federal employment taxes. The assessments totalled $92,256.70. The first assessment was made on September 1, 1980. The government properly filed notice of a tax lien arising from that assessment on December 17, 1980. Intermountain failed to pay the assessments upon demand.

More than two years before the first tax assessment, on May 5, 1978, the North Park Bank of Commerce, the defendant bank's predecessor in interest, authorized a secured loan to Intermountain for $70,000 (the "secured loan"). A financing statement listing the collateral for the secured loan was duly filed with the Secretary of State for the State of Utah on May 15, 1978. The collateral included equipment, inventory and accounts receivable, as well as the proceeds thereof. On October 8, 1980, and on January 16, 1981, the North Park Bank authorized two more loans of $12,500 and $25,000 (respectively, loans "269 U" and "270 U", or, collectively, the "unsecured loans").[1] The loan documents for the unsecured loans provide that the bank "may offset" against those loans "any bank account or any other amounts owed by Bank in any capacity" to Intermountain. Intermountain maintained both a checking account and a savings account with the defendant bank. The bank claims the right to apply any balance in those

---

1. These loans were subsequently "rolled over," but the court will assume for purposes of this motion that the dates of the original loans are the relevant dates.

accounts toward the balance of the unsecured loans.

At or about 9:20 a.m. on July 27, 1981, the bank received notice of an IRS levy purporting to attach all property of Intermountain then in the bank's possession. The bank's vice president, Michael Gomm, examined Intermountain's accounts and determined that its funds on deposit at that time were negligible.[2] Accordingly, Mr. Gomm returned the notice of levy to the IRS with the notation, "7/27/81, 9:30 a.m.; MG, NO FUNDS AVAILABLE." Later that same day, deposits totalling $28,416.06 were made to Intermountain's checking account. Those deposits included a check for $27,000 from Interwest Construction Company in payment for services rendered by Intermountain. Understandably alarmed by the notice of levy, the bank on July 28, 1981, offset the entire amount in Intermountain's checking account—$29,614.41— against loans 269 U and 270 U.[3] The IRS now seeks to recover that amount from the bank.

Section 6321 of the Internal Revenue Code (the "IRC") provides in part as follows:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6321. The federal tax lien, however, is not self-executing. Thus the IRC authorizes the institution of a civil action in district court to enforce a lien by subjecting "any property, of whatsoever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax." 26 U.S.C. § 7403(a). An alternative to the lien foreclosure suit is the administrative levy. *See* 26 U.S.C. § 6331(a).

In this case, the government understandably does not seek to enforce its levy. Under the IRC, a levy extends "only to property possessed and obligations existent at the time thereof," 26 U.S.C. § 6331(b)). As recited above, the funds on deposit in Intermountain's accounts when the levy was served were negligible. Instead, the government seeks to foreclose its lien against the funds that the bank, subsequent to the levy, offset against the unsecured loans. The government's position is that its lien "attached to the full amount [of funds deposited] in the [taxpayer's] account undiminished by any right of setoff by the bank." Plaintiff's Supplemental Memorandum at 2.

The government concedes that a *levy* is effective only against "amounts in the taxpayer's account which have not previously been removed by actual exercise of the bank's right to setoff." *Id.* at 5. The government would give a much broader effect, however, to a lien foreclosure action. The government argues that because its lien attached to all "property" or "rights to property" of the taxpayer from and after September 1, 1980, by foreclosing that lien it can recover any such "property" in the bank's possession, regardless of the right of offset. In short, the government seeks to create a continuing levy out of an ordinary lien simply by changing its pleadings.

The government's pleading strategy brings to this court's attention two relatively recent decisions of the United States Supreme Court that discuss and illustrate the differences between a lien foreclosure suit and an administrative levy. In *United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983), the Court al-

---

**2.** The bank admits that there was $241.48 in Intermountain's savings account and $66.57 in its checking account, and therefore has offered to pay those amounts plus accrued interest to the IRS.

**3.** Apparently, the amount of the offset was greater than the total of the deposits and the existing balance in the checking account because some outstanding checks were not paid. A debit memo dated July 28, 1981, notified Intermountain of the offset:

"This is to advise you that we have this day charged your account as follows: We have transferred balance in your account per right of offset and applied to loans 269 & 270."

lowed the IRS to *foreclose* a federal tax lien and force the sale of certain property in which the delinquent taxpayer's spouse had a vested homestead interest. The Court emphasized that section 7403, on its face, applies to "property ... in which [the taxpayer] has *any right, title, or interest*," while section 6331, on its face, applies only to "property and rights to property ... *belonging to* [the taxpayer]." 461 U.S. at 695–96, 103 S.Ct. at 2143–44. It was beyond question that the taxpayer had *some* interest in the property, even if it did not "belong to" him. Thus the broader language of the foreclosure provision permitted the sale of the entire property.[4]

In *United States v. National Bank of Commerce*, 472 U.S. ——, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985) (*NBC*), the Court allowed the IRS to *levy* upon a joint bank account even though the IRS did not know whether the delinquent taxpayer, one of the joint depositors, actually had any money in the account at all. All of the money might well have "belonged to" the delinquent taxpayer's joint depositors. The Court emphasized that the administrative levy is a "provisional remedy" which does not purport to determine the rights of third parties who also claim an interest in the property levied upon; those rights are to be determined "*after* the levy is made, in postseizure administrative or judicial hearings." 472 U.S. at ——, 105 S.Ct. at 2930, 86 L.Ed.2d at 581 (emphasis in original) (footnote omitted).[5]

Neither *Rodgers* nor *NBC* supports the government's contention that a lien foreclosure action entitles the government to recover something that a levy could not attach. The government's position is entirely overbroad. A lien foreclosure action,

like an administrative levy, must be directed against specific property. Here, the government could have levied against Interwest Construction and thus intercepted the check for $27,000. Or the government could have repeatedly levied against the bank and thus attached whatever sums were on deposit in Intermountain's accounts at the time of the levy. Instead, the government has chosen to foreclose its lien against Intermountain's bank accounts. The government can succeed only if, as of July 27, 1981, Intermountain had an interest in its bank accounts that can be foreclosed by a federal tax lien.

■ Neither *Rodgers* nor *NBC* helps the government. It was not disputed in *Rodgers* that the taxpayer had a property interest under Texas law that could be foreclosed by a valid federal tax lien, but Texas homestead law is irrelevant here. *NBC* does not apply here for two reasons. First, this is an action to foreclose a lien, not to enforce a levy. Second, the Court in *NBC* merely reaffirmed the holding of an "overwhelming majority" of courts that an "unrestricted [state law] right to withdraw constitutes 'property' or 'rights to property' subject to provisional IRS levy." 472 U.S. at ——, 105 S.Ct. at 2926, 86 L.Ed.2d at 576. One must assume, construing tax provisions *in pari materia*, that such a right also constitutes "property" or "rights to property" to which a lien can attach under section 6321. However, Intermountain does not have an unrestricted right to withdraw its funds on deposit. In fact, under Utah law, as more fully explained below, Intermountain's right to withdraw, in the particular circumstances of this case, is severely restricted. So long as Inter-

---

**4.** Interestingly, the Court did not advert to the fact that, under section 6321, quoted above, the tax lien upon which the foreclosure action is based can attach only to "property and rights to property ... belonging to [the taxpayer].

**5.** *NBC* appears at this point to be inconsistent with *Rodgers.* If the funds did not in fact "belong to" the taxpayer, then how could the levy attach? The Court avoided that inconsistency by arguing that the taxpayer's unrestricted state-law "right to withdraw," not the funds themselves, constituted the "property" or "rights to property" "belonging to" the taxpayer. 472 U.S. at ——, 105 S.Ct. at 2926, 86 L.Ed.2d at 576. The taxpayer had an unrestricted "right to withdraw" under state law, subject to later claims by his codepositors; the government, standing as it does in the taxpayer's shoes, had an analogous right to levy, subject to later claim by the codepositors. 472 U.S. ——, 105 S.Ct. at 2927, 86 L.Ed.2d at 577.

mountain is indebted to the bank, and the bank has the power of offset, Intermountain's right to withdraw exists only at the bank's pleasure.

This court might well conclude that a right to withdraw, restricted as it is under Utah law, does *not* constitute "property" or "rights to property" subject to either levy or lien. However, that conclusion, and the analysis that leads to it, strike this court as somewhat artificial. As the dissenting Justices argued in *NBC*, the government is not terribly interested in the naked "right to withdraw," which is relatively worthless unless it represents legal entitlement to funds. —— U.S. at ——, 105 S.Ct. at 2935, 86 L.Ed.2d at 587 (Powell, Brennan, Marshall and Stevens, JJ., dissenting). The government is really interested in *Money*—in this case, the specific funds that the taxpayer had on deposit on June 27, 1981, and that the bank subsequently offset. The simple question is whether the government is entitled to that money.

This court is of the opinion that this question can be answered by answering another equally simple question—whether the taxpayer himself would be entitled to that money if he were now suing in the government's stead—for it is settled beyond dispute that the government's rights as a lienholder cannot exceed the taxpayer's rights. *See United States v. Rodgers*, 461 U.S. at 690–91, 103 S.Ct. at 2141 (agreeing that "the government's lien under § 6321 cannot extend beyond the property interests held by the delinquent taxpayer"). If, after answering that question, one wishes to add that the taxpayer either does or does not have "property" or "rights to property," that serves to bring the case nicely within the statute, but it is neither essential nor helpful to a reasoned decision.

It must first be noted that " 'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property.' " *Aquilino v. United States*, 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (quoting *Morgan v. Commissioner*, 309 U.S. 78, 82, 60 S.Ct. 424, 426, 84 L.Ed. 1035 (1940)). Under Utah law, as under the law of many other jurisdictions, the relationship of a bank to its depositor is generally that of a debtor to a creditor. *See Walker Bank & Trust Co. v. First Security Corp.*, 9 Utah 2d 215, 341 P.2d 944, 946 (1959); *Peoples National Bank of Washington v. United States*, 608 F.Supp. 672, 675 (W.D.Wash.1984) ("once money is deposited in a general bank account, title to the money passes to the bank, and the bank and the depositor assume the relationship of debtor and creditor, respectively"), *aff'd*, 777 F.2d 459 (9th Cir.1985). Such a relationship makes the bank the owner of deposited funds, but the law recognizes that the depositor retains a right to withdraw those funds—a right usually described as a chose in action. *See United States v. Citizens and Southern National Bank*, 538 F.2d 1101, 1105 (5th Cir.1976) ("It is settled law in Georgia that a person who places money in a bank on general deposit loses title to the money and becomes a creditor of the bank"; the funds deposited "are transformed into a chose in action"), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977); *United States v. Third National Bank of Nashville*, 589 F.Supp. 155, 157 (M.D.Tenn.1984) ("the bank owns all the funds deposited with it, and the depositor retains a chose in action to recover those funds").

The right to withdraw may, however, be restricted in some fashion by state law. Specifically, state law might recognize that a bank's debtor/creditor relationship with its depositor is often complicated by the simultaneous existence of the opposite relationship if the depositor is also indebted to the bank. The relationship is further complicated if the bank has a state law right at any moment to apply the depositor's funds to the depositor's outstanding obligations. In such circumstances, one cannot simply assert that, because the depositor has some money in the bank, he has a right to that money to which a federal tax lien can attach.

Conceptually, if a depositor is simultaneously indebted to the bank in an amount greater than the total of his deposits, and if the bank can at any moment apply the depositor's funds to his outstanding obligations, the depositor is in no position to force the bank to honor his demand for the funds. As a practical matter, the bank may choose to continue to honor the depositor's demands notwithstanding its right of offset. But in so doing the bank is really extending a grace, not fulfilling a legal duty.

The Utah Code contains a specific provision that appears to this court to embody that concept. Under a section with the heading, "When certain credits become available for withdrawal," the Utah Code provides:

> A deposit of money in a bank is final when made but, *subject to any right of the bank to apply the deposit to an obligation of the customer*, the deposit becomes available for withdrawal as of right at the opening of the bank's next banking day following receipt of the deposit.

Utah Code Ann. § 70A–4–213(5). The law in the State of Utah could not be more clear: if the bank has a right of offset, the depositor does not have an unrestricted right to withdraw his funds. Rather, that right is subject to the bank's right to offset.

As noted above, the government "stands in the taxpayer's shoes" when it seeks to enforce its tax assessment against a third party allegedly holding the taxpayer's "property." *See United States v. Rodgers*, 461 U.S. at 691, 103 S.Ct. at 2141; *United States v. Bank of Shelby*, 68 F.2d 538 (5th Cir.1934); 4 B. Bittker, Federal Taxation of Income, Estates, and Gifts ¶ 111.5.4, at 111–102 (1981). Although research uncov-

ered no cases, it appears to this court that if a depositor were to bring suit in Utah against a bank for failure to honor a check, the bank could rely on its contractual right of setoff and the above-quoted statute to argue that it did not wrongfully fail to honor the check because, when the check was drawn, the depositor was indebted to the bank in an amount that exceeded his deposits. According to the plain and unambiguous language of the statute, the depositor's right to withdraw is *subject to* the bank's right of offset. The government can fare no better in an action to foreclose a lien.[6]

Accordingly, the court orders that the plaintiff's motion for summary judgment be and hereby is DENIED, and that the defendant Cache Valley Bank's cross-motion for summary judgment be and hereby is GRANTED. The plaintiff shall take nothing by this action. Each party shall bear its own costs.

---

**6.** Suppose, for the sake of illustration, that on July 27, 1981, after depositing the check from Interwest, Intermountain had written a check to the IRS for $29,614.41 as payment for some of the assessed and delinquent taxes. Apparently, under Utah law, the bank would have been under no legal duty to honor that check. If Intermountain then sued the bank for wrongful dishonor, the bank would have had a perfect defense. In the case at bar, the government's attempt to foreclose its lien is analogous to Intermountain's supposed attempt to force the bank to honor its check. Neither can prevail. This does not relegate the government to the status of a mere creditor; it simply places the government in the shoes of the taxpayer.