The **STATE BANK OF FRASER,**
Plaintiff–Appellee,
Cross–Appellant,

v.

**UNITED STATES of America,**
Defendant–Appellant,
Cross–Appellee.

**Nos. 87–1666, 87–1789.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 19, 1988.
Decided Nov. 18, 1988.
Rehearing Denied Dec. 29, 1988.

---

Gary R. Allen, Chief, Appellate Section (argued), Wm. Estabrook, Tax Div., Dept. of Justice, Douglas Coulter, William S. Rose, Jr., Washington, D.C., for plaintiff-appellee, cross-appellant.

G. Timothy Moore (argued), Mt. Clemens, Mich., for defendant-appellant, cross-appellee.

Before MARTIN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

The United States (the Government) appeals and The State Bank of Fraser (the Bank) cross appeals from the judgment of the district court in this wrongful levy action brought under 26 U.S.C. § 7426[1] in which the Government counterclaimed for the purpose of enforcing a levy pursuant to 26 U.S.C. § 6332(c).[2] For the following reasons, we affirm in part and reverse in part the judgment of the district court.

## I.

On March 11, 1982, Cannon Electric Company[3] entered into a written security agreement with the Bank. Under the terms of the agreement, the Bank received a security interest in all of Cannon's existing and after acquired assets, including accounts and contract rights.[4] This agreement secured a promissory note executed by Cannon in favor of the Bank. At all relevant times, Cannon owed the Bank the principal sum of not less than $162,541.40.

On November 29, 1982, a delegate of the Secretary of the Treasury made an assessment against Cannon for social security and withheld income taxes due for the third quarter of 1982. Similar assessments were made for the fourth quarter of 1982 and the first two quarters of 1983. Despite notice and demand for payment, Cannon failed or refused to pay the assessed tax liabilities, which amounted to $150,853.11 exclusive of accrued interest and penalties.

On September 26, 1983, the Secretary filed a Notice of Federal Tax Lien with the Michigan Secretary of State with respect to the tax liabilities for the third and fourth quarter of 1982 and the first quarter of 1983. On November 1, 1983, a notice was filed with respect to the liabilities for the second quarter of 1983.

Commencing on September 12, 1983, the Secretary began serving notices of levy on various accounts receivable debtors of Cannon. Pursuant to these notices of levy, the Government received $88,447.24, which it applied to Cannon's outstanding assessments. The only documents served on the accounts receivable debtors were the notices of levy.

On November 4, 1983, the IRS delivered a notice of levy to the Bank on account of the outstanding tax liabilities of Cannon. At that time, Cannon maintained a checking account with the Bank which contained a balance of $21,225.14 and was in default on its loan with the Bank. After receiving the notice of levy, the Bank debited Cannon's account in the amount of $21,225 and offset the amount against the delinquent loan balance owed to the Bank. The Bank did not make any payment with respect to the November 4th notice of levy.

1. Section 7426 reads in pertinent part as follows:

**Civil actions by persons other than taxpayers**

**(a) Actions permitted.—**

(1) **Wrongful levy.**—If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States.

2. Section 6332(c) reads in pertinent part as follows:

**Surrender of property subject to levy**

**(c) Enforcement of levy.—**

(1) **Extent of personal liability.**—Any person who fails or refuses to surrender any property or rights to property, subject to levy, upon demand by the Secretary, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, . . . .

(2) **Penalty for violation.**—In addition to the personal liability imposed by paragraph (1), if any person required to surrender property or rights to property fails or refuses to surrender such property or rights to property without reasonable cause, such person shall be liable for a penalty equal to 50 percent of the amount recoverable under paragraph (1). . . .

3. Cannon Electric Company is the taxpayer in this case. It was not a party below.

4. The Bank filed a financing statement with respect to this agreement with the Michigan Secretary of State on March 13, 1982.

On October 2, 1984, the Bank made a formal written claim to the IRS for return of funds received by the IRS from Cannon's accounts receivable debtors. On October 23, 1984, the IRS denied the Bank's claim.

On April 19, 1985, the Bank filed a complaint seeking return of funds received by the Government pursuant to the notice of levy served on Cannon's accounts receivable debtors. The basis of its complaint was that its security interest in the accounts receivable took priority over the tax lien. On July 10, 1985, the Government answered and pled as one of its defenses that as to certain of the levies the statute of limitations had run. The Government also filed a counterclaim for enforcement of the November 4, 1983 levy. It sought $21,225.14, the amount in Cannon's checking account, and a fifty percent penalty for failure to honor the levy.

The Bank filed a motion for summary judgment and the Government filed a motion for partial summary judgment. A hearing was held, after which the district court made the following orders:

—The Bank was awarded a judgment of $22,957.22 plus interest. This amount represented the funds received by the Government pursuant to notices of levy served on or after January 2, 1984.

—The Government was awarded a judgment of $21,225.14 on its counterclaim for enforcement of the November 4, 1983 levy.

—The Government's claim for the fifty percent penalty was dismissed for the reason that the court found that the Bank had reasonable cause for failing to honor the levy.

—The Bank's claim for return of $34,-370.49 which represented the funds received by the Government pursuant to notices of levy served prior to January 2, 1984 was dismissed.

—A trial was ordered to determine when three additional notices of levy were served, since there was a factual dispute over whether they were served prior to January 2, 1984.

The matter was tried on March 5, 1987, after which the court found that the three notices of levy in question were served prior to January 2, 1984 and, therefore, the Bank's action to recover funds received pursuant to these notices was time barred. Judgment for the Government was entered on May 12, 1987.

On July 9, 1987, the Government filed a notice of appeal. It appeals from the judgment for the Bank for return of the funds received by the Government pursuant to notices of levy served after January 2, 1984 and from the dismissal of the claim for the fifty percent penalty. On July 24, 1987, the Bank cross-appealed from the judgment in favor of the Government on its action to enforce the November 4, 1983 levy and from the dismissal of its claim to funds received by the Government pursuant to notices of levy served prior to January 2, 1984.

This case presents five issues. Three issues arise from the Government's action to enforce the November 4, 1983 levy. The Bank argues that since it exercised its right to setoff on Cannon's account after receiving the notice of levy it did not hold property or rights to property belonging to Cannon. The Bank also argues that the Government should have been estopped from asserting its counterclaim for enforcement of the levy. The Government argues that the Bank did not have reasonable cause for failing to honor the levy and, therefore, it should have been assessed the fifty percent penalty. The last two issues arise from the Bank's wrongful levy action. The Government argues that the Bank did not have a priority interest in Cannon's after acquired accounts receivables. Finally, the Bank argues that its wrongful levy action was not time barred.

## II.

In *United States v. National Bank of Commerce*, 472 U.S. 713, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985), the Supreme Court summarized the statutory scheme whereby the Government collects taxes from recalcitrant taxpayers.

Section 6321 of the Code, 26 U.S.C. § 6321, provides: 'If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.' Under the succeeding § 6322, the lien generally arises when an assessment is made, and it continues until the taxpayer's liability 'is satisfied or becomes unenforceable by reason of lapse of time.'

The statutory language 'all property and rights to property,' appearing in § 6321 ..., is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have. 'Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes.'

A federal tax lien, however, is not self-executing. Affirmative action by the IRS is required to enforce collection of the unpaid taxes. The Internal Revenue Code provides two principal tools for that purpose. The first is the lien-foreclosure suit. Section 7403(a) authorizes the institution of a civil action in federal district court to enforce a lien 'to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax.' Section 7403(b) provides: 'All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto.' The suit is a plenary action in which the court 'shall ... adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property.' § 7403(c). The second tool is the collection of the unpaid tax by administrative levy. The levy is a provisional remedy and typically 'does not require any judicial intervention.' The governing statute is § 6331(a). It authorizes collection of the tax by levy which, by § 6331(b), 'includes the power of distraint and seizure by any means.'

In the situation where a taxpayer's property is held by another, a notice of levy upon the custodian is customarily served pursuant to § 6332(a). This notice gives the IRS the right to all property levied upon, and creates a custodial relationship between the person holding the property and the IRS so that the property comes into the constructive possession of the Government. If the custodian honors the levy, he is 'discharged from any obligation or liability to the delinquent taxpayer with respect to such property or rights to property arising from such surrender or payment.' § 6332(d). If, on the other hand, the custodian refuses to honor a levy, he incurs liability to the Government for his refusal. § 6332(c)(1).

The administrative levy has been aptly described as a 'provisional remedy.' In contrast to the lien-foreclosure suit, the levy does not determine whether the Government's rights to the seized property are superior to those of other claimants; it, however, does protect the Government against diversion or loss while such claims are being resolved. 'The underlying principle' justifying the administrative levy is 'the need of the government promptly to secure its revenues.' 'Indeed, one may readily acknowledge that the existence of the levy power is an essential part of our self-assessment tax system,' for it 'enhances voluntary compliance in the collection of taxes.' 'Among the advantages of administrative levy is that it is quick and relatively inexpensive.'

*Id.* at 719–20, 105 S.Ct. at 2923–24 (citations omitted).

The first three issues arise from the Bank's failure to honor the November 4, 1983 notice of levy.

### A.

The extent of personal liability for failing to honor a levy is the value of the property or rights to property not surrendered. 26 U.S.C. § 6332(c)(1). "The courts uniformly have held that a bank served with an IRS notice of levy 'has only two defenses for a failure to comply with the demand.' One defense is that the bank, in the words of § 6332(a), is neither in 'pos-

session of' nor 'obligated with respect to' property or rights to property belonging to the delinquent taxpayer. The other defense ... is that the taxpayer's property is 'subject to a prior judicial attachment or execution.'" *National Bank of Commerce*, 472 U.S. at 722–23, 105 S.Ct. at 2925–26 (citations omitted). The Bank argues that the levy was unenforceable against it because it was not in possession of or obligated with respect to property or rights to property belonging to Cannon.

Factually, there was no dispute on this issue. The parties stipulated that on November 4, 1983 Cannon had a checking account with the Bank which had $21,225.14 in it. Cannon had the right to withdraw funds from that account. There is also no dispute that under its security agreement the Bank had the contractual right to set off these funds against Cannon's delinquent loan with the Bank. Finally, it is also undisputed that the Bank chose to set off against these funds after it was served with the notice of levy.[5]

" '[I]n the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer has in the property....'" *Aquilino v. United States*, 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960) (quoting *Morgan v. Commissioner*, 309 U.S. 78, 82, 60 S.Ct. 424, 426, 84 L.Ed. 585 (1940)). The Bank correctly asserts that under Michigan law, funds on general deposit in a bank are the property of the bank. *See Guilds v. Monroe County Bank*, 41 Mich.App. 616, 619, 200 N.W.2d 769 (1972) (adopting rule stated in 10 Am. Jur.2d, *Banks* § 666 pp. 636–37). It argues that the Government can only acquire the rights that Cannon had at the time of the levy and that since Cannon's rights to the funds in the account were "severely restricted" by the security agreement entered into between the Bank and Cannon, the Government's rights were likewise restricted. In support of its argument, it relies on *United States v. Intermountain Region Concrete Co.*, 636 F.Supp. 280 (D.

Utah 1986), *appeal filed sub nom. United States v. Cache Valley Bank*, No. 86–2432 (10th Cir. Oct. 1, 1986), and *Trust Company v. United States*, 735 F.2d 447 (11th Cir.1984).

In *Intermountain*, a lien foreclosure action, the district court summarized the relevant facts as follows:

At or about 9:20 a.m. on July 27, 1981, the bank received notice of an IRS levy purporting to attach all property of Intermountain then in the bank's possession. The bank's vice president, Michael Gomm, examined Intermountain's accounts and determined that its funds were negligible. Accordingly, Mr. Gomm returned the notice of levy to the IRS with the notation, '7/27/81, 9:30 a.m.; MG, NO FUNDS AVAILABLE.' Later that same day, deposits totalling $28,416.06 were made to Intermountain's checking account. Those deposits included a check for $27,000 from Interwest Construction Company in payment for services rendered by Intermountain. Understandably alarmed by the notice of levy, the bank on July 28, 1981, offset the entire amount in Intermountain's checking account—$29,614.41—against loans 269 U and 270 U. The IRS now seeks to recover that amount from the bank.

636 F.Supp. at 282 (footnotes omitted). The court in granting summary judgment for the bank, looked to Utah law to determine whether the bank would have had to honor a demand by the taxpayer for the funds in its account when the account holder was indebted to the bank. The court found that the depositor in that circumstance does not have an unrestricted right to withdraw the funds and the depositor's right to withdraw was subject to the bank's right of offset. Citing to the rule that the government " 'stands in the taxpayer's shoes' when it seeks to enforce a tax assessment against a third party allegedly holding a taxpayer's 'property' ", the court held that the government could not enforce

---

**5.** Had the Bank set off against Cannon's account before being served with the levy, its position would have been much stronger. *See e.g., Pitts-* *burgh National Bank v. United States*, 657 F.2d 36 (3d Cir.1981).

its foreclosure lien. *Id.* at 285 (quoting *United States v. Rodgers,* 461 U.S. 677, 691, 103 S.Ct. 2132, 2141, 76 L.Ed.2d 236 (1983)).

The applicability of the court's holding in *Intermountain* to this case is severely limited by the fact that it was a lien foreclosure and not a levy enforcement action and the fact that the setoff did not occur after the notice of levy was served. If this case had been a levy enforcement case, and if the bank had attempted to setoff against the accounts of the taxpayer after the notice of levy was served, the court indicated that it would have reached a different result and enforced the levy. *See Intermountain,* 636 F.Supp. at 282. ("The government concedes that a *levy* is effective only against 'amounts in the taxpayer's account which have not previously been removed by actual exercise of the bank's right to setoff.'")

*Trust Company,* 735 F.2d 447, the other case relied on by the Bank, is equally unavailing since it also was not a levy enforcement action, but rather involved a wrongful levy action brought by the bank after it complied with a notice of levy served by the Government.

■ Therefore, the Bank's cases do not provide much guidance in resolving the issue of whether a bank which has a right to offset against a depositor's account can exercise that right against the Government after it has been served with a notice of levy.

The Government argues that since Cannon had the right to withdraw funds at the time of the levy, the Bank held property or rights to property of the taxpayer which the Government could levy upon. It asserts that the Bank cannot defeat the levy by a post-levy exercising of its right to setoff. Decisions from several other jurisdictions support the Government's position. *See United States v. Central Bank,* 843 F.2d 1300, 1309–10 (10th Cir.1988); *J.A. Wynne Co. v. R.D. Phillips Construction Co.,* 641 F.2d 205, 209 (5th Cir.1981) (per curiam); *United States v. Citizens and Southern Nat'l Bank,* 538 F.2d 1101, 1107 (5th Cir.1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977); *United States v. Sterling Nat'l Bank & Trust Co.,* 494 F.2d 919, 922–23 (2d Cir.1974); *Bank of America Nat'l Trust and Savings Assoc. v. United States,* 345 F.2d 624, 625 (9th Cir.) (per curiam), *cert. denied,* 382 U.S. 927, 86 S.Ct. 316, 15 L.Ed.2d 340 (1965); *Bank of Nevada v. United States,* 251 F.2d 820, 826–27 (9th Cir.), *cert. denied,* 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813 (1958); *United States v. Bell Credit Union,* 635 F.Supp. 501, 503 (D. Kansas 1986).

The Bank tries to distinguish these cases by arguing that they are inapplicable because they do not deal with Michigan law. It relies on the *Aquilino* principle that courts look to state law to determine the existence of property or rights of property. This argument is unpersuasive, however, since the key factor relied upon by the cases cited by the Government was the fact that the right of setoff in those cases was not automatic and that it had to be exercised by the bank. *See e.g., Citizens and Southern,* 538 F.2d at 1107 ("Georgia cases involving the right of banks to set off debts against depositor's accounts uniformly indicate the requirement of some positive act.") It is also true under Michigan law that the right of setoff is not automatic, but must be exercised. *See Monroe County Bank,* 41 Mich.App. at 620, 200 N.W.2d 769 ("until the bank elects to exercise its right of setoff anyone in favor of whom checks are drawn and paid takes the funds free of any claim by the bank.")

This position is also supported by section 4–303 of the Uniform Commercial Code which Michigan adopted in section 440.4303 of the Michigan Compiled Laws. Section 4303 deals *inter alia* with the effectiveness of setoffs *exercised* by the payor bank. The official comments to section 4–303 state that the effective time for determining whether a stop-order is too late is when a setoff is *actually made. See* U.C.C. § 4–303 (Official Comments ¶ 5). *See also Baker v. National City Bank,* 511 F.2d 1016, 1018 (6th Cir.1975). Thus, it is clear that a right of setoff has to be exercised or actually made to be effective.

We are persuaded by the Government's position and the cases upon which it relies. The Bank has cited to no case which has allowed a bank to use a setoff to avoid the enforcement of a levy. In this case, it is stipulated that Cannon ·was permitted to draw checks and otherwise withdraw funds from its account when the Bank received the notice of levy. Michigan law, while it does hold that funds on general deposit are the property of the bank, also holds that the bank's right of setoff is not automatic but must be exercised by the bank. It is further stipulated that the bank did not exercise its right of setoff until after it was served with the notice of levy. Since a depositor's access to funds in its account is not restricted until the bank exercises its right of setoff and since the Bank in this case did not exercise its right of setoff until after the levy was served, we conclude that at the time of the levy, the Bank held property or rights to property of Cannon which were subject to the levy. Therefore, since the priority of the Bank's lien or its right of setoff is not a proper defense to a levy enforcement action, we affirm the district court's ruling on this issue.

### B.

The Bank argues that the Government is estopped from asserting its enforcement of levy counterclaim because it did not move to enforce the levy when it was notified by the Bank that it was going to setoff the funds levied upon, and that the Bank acted to its detriment by setting off those funds and crediting them to Cannon's loan account.[6] The basis of its detrimental reliance argument seems to be that because the Government did not seek prompt enforcement of the levy the Bank was forced to defend the counterclaim and that it would lose the funds it credited to the Cannon loan account even though it had a priority interest in them.[7]

"Ordinarily the United States is not estopped by acts of individual officers and agents. At the very minimum some affirmative misconduct by a government agent is required as a basis of estoppel." *United States v. River Coal Co.,* 748 F.2d 1103, 1108 (6th Cir.1984) (citations omitted).

■ The Bank argues that because a local Internal Revenue Service collection policy was contrary to controlling law, it represented affirmative misconduct. The policy that the Bank refers to is an unwritten policy carried out by some revenue agents who when informed that the Bank was exercising a setoff based on a claimed priority interest would satisfy themselves that the priority was genuine and proceed no further. We are not persuaded by the Bank's argument. The fact that in certain circumstances the IRS may not have pursued levies when a bank notified it of a prior lien and setoff, does not establish affirmative misconduct in this case. The allegation that the Government committed an affirmative act is tenuous, since although the Government may have had this local policy there is no evidence that it followed the policy in this case. This is demonstrated by the fact that the Government decided to enforce the levy.

■ We also believe that the Bank's reliance was unreasonable. The law concerning levy enforcement actions is settled, notwithstanding the unofficial local IRS policy. The effect of serving the notice of levy was to convert Cannon's bank account

---

6. There is no time limit on the Government's right to pursue claims against those who fail to honor levies.

   Since the notice of levy served on appellant reduced the debt owed to Andrews to the constructive possession of the United States, it would make no sense to impose a time limit upon bringing an action to enforce the notice of levy, which appellant wrongfully failed to honor, to reduce the property right to the actual possession of the United States.

   The appropriate remedy for one in appellant's position, upon whom a notice of levy has been served which he believes to be wrongful, is to surrender the property and bring an action against the government pursuant to Internal Revenue Code § 7426.

   *United States v. Weintraub,* 613 F.2d 612, 621–22 (6th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980) (footnote omitted).

7. The issue of whether the Bank actually had a priority interest in these funds was not developed by the parties.

to the Government. There is no time limit on the Government's right to enforce the levy and the claim of a priority interest is not a proper defense to a levy enforcement action. Rather, such a defense should be raised in a wrongful levy action. Given the foregoing, we believe the Bank when served with the notice of levy should have filed a wrongful levy action to protect its interests rather than rely on a local unwritten policy.

### C.

The final issue involving the levy enforcement action concerns the district court's decision not to impose the fifty percent penalty on the Bank.

Section 6332(c) provides for a fifty percent penalty if a person required to surrender property or rights to property fails or refuses to do so without reasonable cause. In this case, although the district court found that the Bank was liable for the funds levied upon, it did not impose the penalty since it found that the Bank had reasonable cause for failing to honor the levy.

The Government argues that the Bank's position concerning this levy, i.e., that because it had the right of setoff it did not possess property of the taxpayer, would have been shown to be wrong by a "reasonable investigation" into the controlling law. The Government asserts that there was no "bona fide dispute"[8] as to the levied funds and therefore the penalty should have been applied.

The Bank argues that the district court correctly decided that it had reasonable cause for failing to honor the levy. It relies in part[9] on *United States v. Citizens and Southern National Bank*, 538 F.2d 1101 (5th Cir.1976) and *United States v. Sterling National Bank & Trust Co.*, 494 F.2d 919 (2d Cir.1974), where courts confronted with a similar issue chose not to impose the fifty percent penalty. In *Sterling National Bank*, the court in refusing to impose the fifty percent penalty, raised the following question: "The question here is whether we should penalize the Sterling Bank for forcing the government to litigate an unsettled question of law." *Sterling National Bank*, 494 F.2d at 919. The Bank asserts that in this case the effect of the setoff right on the question of whether the Bank held property which could be levied upon was an unsettled question of Michigan law.

We do not agree with the Bank's position. Although there is no authority interpreting Michigan law on this issue, the Bank has not articulated any aspect of Michigan law which would distinguish this case from the great weight of authority from other jurisdictions. Also, the fact that the Bank has not cited to any case where a bank's unexecuted right of setoff was allowed to defeat a levy enforcement action provides further evidence that the Bank was not litigating an unsettled question of law. As Judge Friendly noted in dissent in *Sterling National Bank*, " 'reasonable cause' should not be read to include a clearly erroneous view of the law, stubbornly adhered to after investigation should have disclosed the error." *Sterling National Bank*, 494 F.2d at 924.

Accordingly, we hold that given the state of the law the Bank did not have reasonable cause for failing to honor the levy. Therefore, the district court erred in failing to impose the section 6332(c) penalty.

### III.

The final two issues concern the Bank's wrongful levy action which was brought to recover funds collected by the Government

---

8. A Senate report accompanying the Tax Lien Act stated that "it is intended that a bona fide dispute over the amount owing to the taxpayer (by the property holder) or over the legal effectiveness of the levy itself is to constitute reasonable cause under [section 6332(c) ]." S.Rep. No. 1708, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin.News 3722, 3740.

9. The Bank also argues that it had reasonable cause for failing to honor the levy due to the actions of the local IRS office. Since we have already concluded that the Bank's reliance on the unwritten local policy was not reasonable, we are not persuaded by this argument.

pursuant to notices of levy served on Cannon's accounts receivable debtors.

### A.

■ Under section 6321 of the Internal Revenue Code, the failure of a taxpayer to pay taxes after demand gives rise to a tax lien in favor of the Government which attaches to all property and rights to property, whether real or personal belonging to such a person. Pursuant to section 6322, the tax lien arises automatically at the time of assessment, continues until the tax liability is satisfied or collection is barred by the statute of limitations, and attaches to after acquired property. *Glass City Bank v. United States*, 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945). The priority of federal liens vis-a-vis other liens is governed by the principles that first in time is first in right and that tax liens are superior to inchoate liens. *United States v. City of New Britain*, 347 U.S. 81, 85–86, 74 S.Ct. 367, 370–71, 98 L.Ed. 520 (1954). "The Federal Tax Lien Act of 1966, 80 Stat. 1125, as amended, 26 U.S.C. § 6323, ... modified the Federal Government's preferred position under the choateness and first-in-time doctrines and recognized the priority of many state claims over federal tax liens." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 738, 99 S.Ct. 1448, 1463, 59 L.Ed.2d 711 (1979) (footnote omitted).

■ This issue involves the provisions of section 6323(c) which reads in pertinent part as follows:

**Protection for certain commercial transactions financing agreements, etc.**

**(1) In general.**—To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

(i) a commercial transactions financing agreement, and ...

(B) is protected under local law against a judgment lien arising, as of the time of the tax lien filing, out of an unsecured obligation.

**(2) Commercial transactions financing agreement**—For purposes of this subsection—

**(A) Definition.**—the term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or

(ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;

but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.

**(B) Limitation on qualified property.**—The term "qualified property", when used with respect to a commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing.

**(C) Commercial financing security defined.**—The term "commercial financing security" means (i) paper of a kind ordinarily arising in commercial transactions, (ii) accounts receivable....

The commercial security agreement entered into between the Bank and Cannon gave the Bank a security interest in all assets of Cannon, including accounts. The agreement defined accounts as follows: "'Accounts' shall consist of accounts, documents, chattel paper, instruments, con-

tract rights, general intangibles, and choses in action...."

At issue on appeal are funds remitted to the Government which were earned after November 11, 1983 [10] from contracts entered into before November 11, 1983.

The district court ruled that the Bank could recover from the Government certain funds which the Government had received from the accounts receivable debtors of Cannon:

As to priority, the Court notes that Regulation 6323(c)(1)(c)(2) distinguishes between a contract right and an account receivable, and the Court finds that the account receivable term is the point at which the bank has an entitlement to— well, first of all, the electric company had the entitlement to the funds which are here in issue. The accounts receivable are the right to payment for goods sold or for services rendered under the regulation. So once performance was rendered by Cannon for the contracts which it had, they became federally defined accounts receivable and constituted proceeds of the contract rights of Cannon Electric.

Cannon acquired rights to property or property in those contracts, then on or before 11-11-83, and the bank had priority over the United States, and to those entered after September 26th, '83, and on or before November 11th, '83.

Although these accounts receivables were earned after November 11, 1983, the contracts which gave rise to the accounts receivable were entered into before November 11, 1983. The Bank had a security interest in the proceeds of contract rights of Cannon. The Bank successfully relied on 26 C.F.R. § 301.6323(c)–1(d) below to obtain the proceeds of the contracts received after November 11, 1983.[11]

Section 301.6323(c)–1(d) provides that a tax lien is not valid with respect to a security interest which comes into existence after the tax lien filing, is in qualified property covered by the terms of a commercial transactions financing agreement entered into before the tax lien filing, and is protected under local law against a judgment arising, as of the time of the tax lien filing, out of an unsecured obligation. The section provides the following definitions of key terms:

*Contract rights:* any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper.

*Accounts receivable:* any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper.

*Qualified property* consists solely of commercial financing security acquired by the taxpayer-debtor before the 46th day after the date of tax lien filing.

Section 6323(c)–1 provides that an account receivable is acquired by the taxpayer at the time, and to the extent, a right to payment is earned by performance. A contract right is acquired at the time the contract is made. Identifiable proceeds which arise from the collection or disposition of qualified property by the taxpayer are considered to be acquired at the time such qualified property is acquired. 26 C.F.R. § 301.6323(c)–1(d).

The Bank argued that although the contract rights turned into accounts receivable upon performance of the contract, the succeeding accounts receivable were proceeds of the contract rights and therefore were acquired before November 11, 1983.

The government argues that this ruling is contrary to the statute. It argues that accounts receivable are not acquired for the purposes of section 6323 until the ser-

---

**10.** This date is the outside limit of the 45 day cutoff provided in section 6323 since the tax lien was filed on September 26, 1983.

**11.** The Bank relied on the following portion of section 301.6323(c)–1(d) which reads as follows: Identifiable proceeds, which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired if the secured party has a continuously perfected security interest in the proceeds under local law. The term "proceeds" includes whatever is received when collateral is sold, exchanged, or collected.

vices giving rise to them are performed. It contests the district court's holding that the funds received in this case were proceeds of contract rights and therefore acquired at the time the contract rights were acquired. It argues that since the accounts receivable in this case were not received until after the 45 day time period the Bank did not have a superior interest in them.

The resolution of this issue centers on a determination of whether the accounts receivables were identifiable proceeds of the contract rights in which the Bank had a protected interest.

One of the purposes of the Federal Tax Lien Act was to "conform the lien provisions of the internal revenue laws to the concepts developed in [the] Uniform Commercial Code." S.Rep. No. 1708, 89th Cong.2d Sess. 1, *reprinted in* 1966 U.S. Code Cong. & Admin.News 3722. Many of the definitions set forth in section 6323 were taken from the provisions of Article 9 of the U.C.C. At the time of the Federal Tax Lien Acts enactment, the U.C.C. included the following in its definition of the term proceeds. "The term also includes the account arising when the right to payment is earned under a contract right." U.C.C. § 9–306 (Text prior to 1972 amendment).[12]

Section 301.6323(c)–1(d) states that "identifiable proceeds which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired...." To accept the Government's argument that the Bank had a priority interest in the contract right, but had no interest in the right when the contract was executed, would render the term collection in section 301.6323(c)–1(d) a nullity as far as contract rights were concerned since the secured creditor cannot collect on the contract rights until the contract is executed. Considering the language of section 301.-6323(c)–1(d) and the language of the pre–1972 version of section 9–306 of the U.C.C., we believe the district court correctly determined that the accounts receivable were proceeds of contract rights in which the Bank had a protected security interest under section 6323.[13]

## B.

The last issue which confronts us is whether the district court erred in ruling that the Bank's wrongful levy action to recover payments made to the IRS pursuant to notices of levy served on Cannon's accounts receivable debtors prior to January 2, 1984 was time barred.

The statute of limitations applicable to the Bank's section 7426 wrongful levy suit is found in 26 U.S.C. § 6532(c). *See* 26 U.S.C. § 7426(h).

**(c) Suits by persons other than taxpayers.—**

**(1) General rule.**—Except as provided by paragraph (2), no suit or proceeding under section 7426 shall be begun after the expiration of 9 months from the date of the levy or agreement giving rise to such action.

**(2) Period when claim is filed.**—If a request is made for the return of property described in section 6343(b), the 9–month period prescribed in paragraph (1) shall be extended for a period of 12 months from the date of filing of such request or for a period of 6 months from the date of mailing by registered or certified mail by the Secretary or his delegate to the person making such request of a notice of disallowance of the part of the request

---

12. Although the U.C.C. was amended in 1972 to eliminate the separate terms accounts and contract rights and merge the two concepts into one under the term account, neither the Internal Revenue Code nor the Regulations were amended to incorporate the U.C.C. changes. One of the official reasons for the U.C.C. change was that the term contract rights had "been troublesome in creating a 'proceeds' problem where a contract right becomes an 'account' by perform-ance...." U.C.C. § 9–106 (Official Reasons for 1972 Change).

13. The Government's argument that this interpretation would make the accounts financing provisions of section 6323(c) irrelevant is not persuasive since not all contract rights are contained in a written document and not all accounts receivable are proceeds of a contract.

to which the action relates, whichever is shorter.

In this case, the Bank filed a formal written claim to the IRS for return of the funds collected from Cannon's accounts receivable debtors on October 2, 1984. The district court ruled that the Bank was foreclosed from recovering payments remitted to the IRS in response to notices of levy served prior to January 2, 1984.[14]

■ The Bank correctly argues that the date that the statute of limitations begins to run is the date of levy. The term date of levy is not defined in section 6532 or any other part of the code. The Bank argues that "date of levy" is defined by section 6502(b). Section 6502 reads in pertinent part as follows:

> § 6502. Collection after assessment
>
> (a) Length of period.—Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun—
>
> (1) within 6 years after the assessment of the tax,
>
> . . . .
>
> (b) Date when levy is considered made.—The date on which a levy on property or rights to property is made shall be the date on which the notice of seizure provided in section 6335(a) is given.[15]

The only authority for the Bank's position is found in an example which follows Treasury Regulation 301.6532–3(c).[16]

*Example (1).* On June 1, 1970, a tax is assessed against A with respect to his delinquent tax liability. On July 19, 1970, a levy is wrongfully made upon certain *tangible* personal property of B's which is in A's possession at that time. On July 20, 1970, notice of seizure is given to A. Thus, under section 6502(b), July 20, 1970, is the date on which the levy is considered to be made. Unless a request for the return of property is sooner made to extend the 9–month period, no suit or proceeding under section 7426 may be begun by B after April 20, 1971, which is 9 months from the date of levy.

26 C.F.R. § 301.6532–3(c) (emphasis added).

While this example does reference section 6502(b) in relation to a proceeding under 7426, it provides limited support since the instant case does not involve a wrongful levy on tangible personal property.

The Government counters the Bank's argument by first noting that a levy upon intangible property which cannot be physically seized is effected by service of the appropriate forms upon the party holding the property. The Supreme Court reviewed this procedure in *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350, 97 S.Ct. 619, 627, 50 L.Ed.2d 530 (1977):

> Both real estate and personal property, tangible and intangible, are subject to levy. Levy upon tangible property normally is effected by service of forms of levy or notice of levy and physical seizure of the property. Where that is not feasible the property is posted or tagged.

---

14. The district court arrived at this date by subtracting nine months from the date the Bank filed its claim with the Government.

15. Section 6335(a) reads as follows:

(a) Notice of seizure.—As soon as practicable after seizure of property, notice in writing shall be given by the Secretary to the owner of the property (or, in the case of personal property, the possessor thereof), or shall be left at his usual place of abode or business if he has such within the internal revenue district where the seizure is made. If the owner cannot be readily located, or has no dwelling or place of business within such district, the notice may be mailed to his last known address. Such notice shall specify the sum demanded and shall contain, in the case of personal property, an account of the property seized and, in the case of real property, a description with reasonable certainty of the property seized.

The Bank argues that the notices of levy served in this case do not comply with section 6335(a) since they were not given after service and they do not contain the mandatory accounting of property seized.

16. The Bank does not cite to any case nor did this court's research uncover any case which applies section 6502(b)'s definition of date when levy is made to an action governed by section 6532.

Because intangible property is not susceptible of physical seizure, posting, or tagging, levy upon it is effected by serving the appropriate form upon the party holding the property or rights to property. See Treas.Reg. § 301.6331–1(a)(1), 26 CFR § 301.6331–1(a)(1) (1976).

Section 301.6331–1(a)(1) differs from section 6502 in its answer to the question when is a levy made.

*Levy may be made by serving a notice of levy* on any person in possession of, or obligated with respect to, property or rights to property subject to levy, including receivables, bank accounts, evidences of debt, securities, and salaries, wages, commissions, or other compensation.

26 C.F.R. § 301.6331–1(a)(1) (emphasis added).

The Government goes on to argue that the service of the notice of levy in this case was sufficient to begin the running of the statute of limitations.

We agree with the Government's position and hold that the service of the notices of levy on Cannon's accounts receivable debtors commenced the running of the statute of limitations set forth in section 6532(c). We note that several courts have acknowledged this interpretation of the statute. *See American Honda Motor Co. v. United States,* 363 F.Supp. 988, 993 (S.D.N.Y.1973); *DeGregory v. United States,* 395 F.Supp. 171, 173 (E.D.Mich. 1975); *Newport Nat'l Bank v. United States,* 556 F.Supp. 94, 97 (D.R.I.1983); *Carlos v. New York State Dept. of Taxation,* 531 F.Supp. 359, 362 (N.D.N.Y.1981); *United Specialties Inc. v. United States,* 443 F.Supp. 87, 88 (D.D.C.1977); *Stuyvesant Ins. Co. v. Department of Treasury,* 378 F.Supp. 7, 10 (S.D.N.Y.1974). *See also* Mertens, *Law of Federal Taxation* § 54A.72 (1987) ("The nine month period acts as a statute of limitations and commences on the date on which the notice of levy is served.").

Accordingly, we conclude that the district court correctly determined that the Bank's action to recover funds received by the Government from notices of levy

served prior to January 2, 1984 were time barred.

## IV.

For the foregoing reasons, the district court's judgment concerning the fifty percent penalty is REVERSED. All other aspects of the judgment are AFFIRMED and the case is REMANDED for imposition of the fifty percent penalty.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I concur in the disposition of all but one of the issues raised on appeal. That one is the issue of whether it was error for the district court to refrain from imposing a 50% penalty on the Bank. I cannot say that the district court was wrong in concluding that the Bank had "reasonable cause" for acting as it did when served with the Government's demand for the proceeds of Cannon's bank account, and I would therefore affirm the judgment of the district court across the board.

Before the Government had any tax lien on Cannon's property, the Bank had a security interest in the property. It is undisputed that the Bank's security interest extended to Cannon's checking account, which had a balance of $21,225.14 when the notice of levy was served in November of 1983. The Bank believed—honestly, if erroneously—that if it were to pay the $21,-225.14 over to the Government, as demanded in the notice of levy, it could get the money back through a wrongful levy action brought under 26 U.S.C. § 7426. Such an action would have to be brought within the nine month period prescribed by 26 U.S.C. § 6532(c); the statute of limitations would run in August of 1984.

Doing exactly what it had always done in the past in such situations, the Bank paid the proceeds of the customer's account directly to itself and told the Government, in writing, what it had done. There was no dissembling, no misrepresentation, and no fraudulent concealment. The Government knew perfectly well that from the Bank's vantage point, the Bank had merely put

itself in the position it would have been in had it incurred the trouble and expense of paying the money over to the Government and then recovering it back under § 7426. The Government had not objected to the Bank's use of the alternative "self-help" procedure in the past.

On November 17, 1983, the Government hand-delivered a "final demand" (IRS Form 680–C) to a "vault clerk" of the Bank. (What the vault clerk may have done with the final demand form is uncertain; the officers of the Bank apparently knew nothing about it until the filing of the Government's counterclaim in July of 1985.) The Form 680–C did not assert that the Government's tax lien was superior to the Bank's security interest, nor did it deny that the Bank would ultimately be able to recover the $21,225.14 in a wrongful levy action. In bold print, indeed, the form said **"Please see the provisions of section 6332 of the Internal Revenue Code on the back of this form"**—and the Supreme Court has made it clear that § 6332 of the Internal Revenue Code gives the Government nothing more than a "provisional remedy" which "does not determine whether the Government's rights to the seized property are superior to those of other claimants...." *United States v. National Bank of Commerce*, 472 U.S. 713, 721, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985).

Almost a year and a half went by without any further action on the Government's part. Only after the Bank had sued the Government in April of 1985 did the Government bestir itself to countersue for the disputed $21,225.14. By that time, of course, the Government could take comfort in the knowledge that a wrongful levy claim by the Bank with respect to the $21,-225.14 would be barred by the statute of limitations. The fact that the Government ultimately prevailed on its counterclaim does not mean that the Bank had acted unreasonably. The district court was not persuaded that the Government had shown the Bank to have acted without reasonable cause, and I am not persuaded that the Government has shown the district court to have erred in this regard. Insofar as this court's judgment is to the contrary, I respectfully dissent.