**ATLANTIC STATES CONSTRUCTION, INC., Plaintiff,**

v.

**HAND, ARENDALL, BEDSOLE, GREAVES AND JOHNSTON, et al., Defendants.**

**COLONIAL BANK, Defendant–Appellant,**

v.

**INTERNAL REVENUE SERVICE, United States of America, Defendant–Appellee.**

No. 88–7592.

United States Court of Appeals, Eleventh Circuit.

Jan. 29, 1990.

---

Irvin Grodsky, Mobile, Ala., for defendant-appellant.

John J. Boyle, David I. Pincus, William Rose, Gary Allen, U.S. Dept. of Justice, Appellate Section, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before KRAVITCH, JOHNSON and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Against the backdrop of the Federal Tax Lien Act of 1966, we are confronted in this case with the issue of whether a subcontractor participating in a federal government contract possessed a contractual right to receive an equitable adjustment for delay expenses such that the subcontractor's performance of its responsibilities under the subcontract gave rise to an account as defined under Alabama law. Concluding that the district court erred in failing to accord the provisions of the subcontract the specialized construction developed under the law governing federal contract claims and that this error led the district court to mistakenly conclude that the federal government's tax liens had priority over a bank's security interest in the subcontractor's accounts, we reverse the judgment of the district court.

## I. BACKGROUND

### A. *Creation of the Fund*

The facts of this case are undisputed. On June 30, 1980, Atlantic States Construc-

tion, Inc. ("Atlantic States"),[1] became the prime contractor on a United States Department of the Navy contract for construction at the Oil Spill Prevention Facility in Portsmouth, Virginia. Among other things, this contract had a suspension of work clause that provided for an equitable adjustment to the contract price in the event that the government unreasonably delayed the performance of the contract.[2]

On October 15, 1980, Process and Systems Engineering Company, Inc. ("P & S") and Atlantic States entered into a subcontract agreement, whereby P & S agreed to perform a certain portion of Atlantic States's work under the Navy contract. Of particular relevance to this appeal, this contract had an "exculpatory clause" which provided that P & S would not hold Atlantic States liable for damages resulting from any delays in performance of the contract, including those caused by the federal government; the exculpatory clause did provide, however, that Atlantic States "shall cooperate" with P & S to enforce any claim arising from delay against the federal government.[3] In addition, the subcontract incorporated the "suspension of work" provision of the contract between the Navy and Atlantic States.

Work under the contract was suspended by the Navy's contracting officer from April 2, 1981 to January 11, 1982. At that time the work suspension was lifted, P & S resumed work and completed the project on March 4, 1982.

Because it had incurred increased costs in the fulfillment of its contractual responsibilities due to the issuance of the suspension of work directive, P & S submitted a certified claim to Atlantic States seeking additional compensation for its increased expenses on September 7, 1982. Atlantic States in turn submitted the P & S claim to the Department of the Navy seeking an equitable adjustment to its contract to compensate P & S for the increased expenses.

On August 2, 1984, the Navy agreed that an adjustment should be made to the contract to compensate P & S for the increased costs associated with the work suspension. After subsequent negotiations, the Navy and P & S agreed that the Navy would pay Atlantic States $43,888 as an equitable adjustment to the final contract price. It was further agreed that P & S was to receive

---

1. The original contract was entered into by McDonough Construction Company. Sometime thereafter Atlantic States succeeded to McDonough's rights and duties under the Navy contract. For the sake of simplicity, and because the identity of the prime contractor is relevant for background purposes only, we shall refer to any actions taken by McDonough Construction Company prior to the succession of rights and duties by Atlantic States as having been taken by Atlantic States.

2. The "suspension of work" provisions can be found in Section 17 of the General Provisions of the Construction Contract which, in pertinent part, provides:

   (a) The Contracting Officer may order the Contractor in writing to suspend, delay, or interrupt all or any part of the work for such period of time as he may determine to be appropriate for the convenience of the Government.
   (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this contract, or by his failure to act within the time specified in this contract (or if no time is specified, within a reasonable time), an adjustment shall be made for any

increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed or interrupted by any other cause, including the fault or negligence of the Contractor, or (2) for which an equitable adjustment is provided for or excluded under any other provision of this contract.

3. Article III(c) of the subcontract agreement between Atlantic States Company and P & S reads as follows:

   (c) Contractor shall not be liable to the Subcontractor for delay to Subcontractor's work by the act, neglect or default of the Owner, or the Architect, or by reason of fire or other casualty, or on account of riots, or of strikes, or other combined action of the workmen or others, or on account of any acts of God, or any other cause, beyond Contractor's control, or on account of any circumstances caused or contributed to by the Subcontractor; but Contractor shall cooperate with Subcontractor to enforce any just claim against the Owner or Architect for delay.

$41,631 as an equitable adjustment to compensate it for its delay costs. On June 9, 1986, the Navy issued a check payable to Atlantic States for the additional contract price.

### B. *The Claims for P & S's Additional Payment*

Upon receipt of the Navy's check, Atlantic States was confronted by three independent parties, Colonial Bank ("Colonial"), the Internal Revenue Service ("IRS"), and the law firm of Hand, Arendall, Bedsole, Greaves & Johnson ("Hand, Arendall"), each claiming an interest in P & S's portion of the delay expenses. Colonial Bank premised its claim on the basis of a perfected security interest "in all accounts, contract rights and rights to payment of every kind now or at any time hereafter arising out of the business of [P & S]." This security interest had originally been granted to the First National Bank of Fort Worth, which had perfected its security interest on March 25, 1982, and had later assigned its security interest to Colonial.[4] On October 28, 1985, Colonial informed Atlantic States that it was entitled to $26,-401.32 of P & S's proceeds.

The IRS's interest was premised upon the fact that P & S had failed to pay payroll taxes in 1982 and 1983. Consequently, in early 1983 and continuing until June 21, 1985, the IRS filed seven separate tax liens with the Probate Judge of Mobile County, thereby perfecting its tax liens against P & S.[5] On July 25, 1985, the IRS filed a Notice of Levy on Atlantic States claiming a total of $21,603.54 in taxes plus statutory additions.

Finally, on October 30, 1985, Hand, Arendall informed Atlantic States that it was entitled to $16,000 of P & S's contractual proceeds by virtue of an existing attorney's lien.

### C. *Procedural History*

Atlantic States initiated this lawsuit by filing a complaint in interpleader, in which it sought to determine entitlement to the $41,631.00 that the Navy had agreed to pay P & S as compensation for delays and work suspensions on the Oil Spill Prevention Facility. Atlantic States named four defendants to the action: (1) Hand, Arendall; (2) Colonial; (3) the IRS; and (4) P & S.[6]

On October 21, 1987, the district court, pursuant to a stipulation by the parties, entered a judgment in favor of Hand, Arendall in the amount of $16,143.60. That judgment has not been appealed by any party and is not at issue here.

On January 7, 1988, the district court issued an order ruling in favor of the United States on cross-motions for summary judgment filed by the United States and Colonial, the only two remaining parties contesting entitlement to the funds. Later, however, the district court granted Colonial leave to file a second motion for summary judgment. Finally, on June 17, 1988, the district court entered a second order denying Colonial's second motion for summary judgment, and granting *sua sponte* summary judgment in favor of the United States. In its order, the court held that by virtue of the exculpatory clause in P & S's subcontract agreement with Atlantic States, P & S had no right to payment for delay expenses. Inasmuch as P & S had no right to payment, the district court concluded that the funds at issue could not be considered an account of P & S under 1975 Ala.Code § 7–9–106 until such time that the Navy paid Atlantic States for delay expenses. Because the United States had completed perfection by filing its last Notices of Liens almost a year before the Navy finally made payment, the district court determined that the United States's liens had priority over Colonial's security

---

**4.** It is uncontested that the security interest has been continuously perfected since March 25, 1982.

**5.** The IRS also filed notice of a tax lien against P & S with the Probate Judge of Mobile County on January 8, 1982. The parties agree that this lien

has been satisfied and is therefore not relevant to this appeal.

**6.** P & S has never claimed an independent entitlement to any portion of the fund involved in this case, but has instead, supported Colonial Bank's claims of entitlement.

interest. Upon entry of a final judgment by the district court, notice of appeal was timely filed. Fed.R.App.P. 4(a)(1).

## II. DISCUSSION

On appeal, Colonial argues that the district court misconstrued P & S's contractual rights under the subcontract by giving an overly broad reading of the subcontract's exculpatory clause. Colonial contends that, notwithstanding the exculpatory clause, the subcontract gave P & S a contractual right to an equitable adjustment of its costs of performance should the Navy unreasonably delay its performance of the subcontract. Because the Navy did suspend construction at the Oil Spill Prevention Facility for an unreasonable length of time, Colonial maintains that when, after the suspension of work order was lifted, P & S resumed and completed performance of its obligations under the subcontract, an account for the proceeds at issue here was created. P & S completed its work on March 4, 1982. As of that date, the relevant federal tax liens had not yet been filed. Accordingly, Colonial concludes that its security interest in the funds is senior to the federal government's tax liens.

### A. Setting the Background: The Federal Tax Lien Act of 1966

In both *Rice Investment Co. v. United States*, 625 F.2d 565 (5th Cir.1980)[7] and *Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040 (5th Cir.1972), *cert. denied sub nom. Pecos County State Bank v. United States*, 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973), this court engaged in lengthy discourses on the interaction between competing federal tax liens and private liens and the manner in which priority is to be determined. Because, as the parties agree, the tax code provisions merely

provide the backdrop for what ultimately is an interpretation of federal contract law and state law, only a brief discussion of the tax code is necessary here.

■ Under section 6321(a) of the Internal Revenue Code,[8] the failure of a taxpayer to pay taxes after demand gives rise to a tax lien in favor of the United States which attaches to all property and rights to property, whether real or personal, belonging to such a person. Moreover, property acquired after the tax lien arises is reached by the lien. Since a federal tax lien is wholly a creature of federal law, the consequences of a lien that attaches to property interests, e.g., priority determinations, are matters of federal law. *See United States v. Rodgers*, 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983); *United States v. Pioneer American Insurance Co.*, 374 U.S. 84, 88, 83 S.Ct. 1651, 1655, 10 L.Ed.2d 770 (1963).

Traditionally, under federal tax law, two basic principles governed the adjudication of priority of competing liens: (i) "the first in time is the first in right"; and (ii) a federal tax lien is superior to a nonfederal lien that is inchoate.[9] *United States v. City of New Britain*, 347 U.S. 81, 85–86, 74 S.Ct. 367, 370–71, 98 L.Ed. 520 (1954). *See generally Texas Oil & Gas Corp.*, 466 F.2d at 1044–46.

However, "[t]he Federal Tax Lien Act of 1966, 80 Stat. 1125, as amended, 26 U.S.C. § 6323, ... modified the Federal Government's preferred position under the choateness and first-in-time doctrines and recognized the priority of many state claims over federal tax liens." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 738, 99 S.Ct. 1448, 1463, 59 L.Ed.2d 711 (1979) (footnote omitted). As recognized by our earlier cases, in enacting the Federal Tax Lien Act of 1966, Congress sought "to conform the

---

7. This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

8. All issues of relevance take place prior to 1986; consequently, although the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, redesignated the Internal Revenue Code of 1954 as the Internal Revenue Code of 1986, all refer-

ences to the Code in this opinion will be to the Internal Revenue Code of 1954 as amended.

9. For a nonfederal lien to be considered choate, "the identity of the lienor, the property subject to the lien and the amount of the lien must be established beyond any possibility of change or dispute." *Rice Investment Co.*, 625 F.2d at 568.

lien provisions of the Internal Revenue Code to the concepts developed in the Uniform Commercial Code" and "to provide some limited but specific relief from the harshness of the choateness rule...." *Rice Investment Co.*, 625 F.2d at 569. Among its various provisions, the Act provided certain conditions and limitations on the validity and priority of federal tax liens as against individuals holding security interests in property which is the subject of such a lien. For example, the Act's amendments to § 6323 provided a statutory mechanism by which, under certain circumstances, individuals holding perfected security interests under the U.C.C. provisions of state law prior to the filing of a federal tax lien were entitled to priority over the federal liens, regardless of what result might have been otherwise dictated by federal common law. *See, e.g., Aetna Insurance Co. v. Texas Thermal Industries*, 591 F.2d 1035, 1038 (5th Cir.1979) (per curiam) (Federal Tax Lien Act, as codified at 26 U.S.C. § 6323, supplants application of the choateness doctrine with respect to tax lien priority questions as to which that statute provides an unambiguous federal law answer).[10]

In cases in which the priority of a security interest and a federal tax lien are contested, the Act identifies two distinct situations in which a security interest may have priority over a federal tax lien: when the security interest exists prior to the Internal Revenue Service's filing of notice of the tax lien, 26 U.S.C.A. § 6323(a), and when the security interest arises after the filing of the tax lien but within forty-six days of the date of filing, 26 U.S.C.A. § 6323(c). *See* Passamano, *Questions of Priority: Se-cured Lender Versus A Federal Tax Lien*, 93 Com.L.J. 361 (1988). *See generally Rice Investment Co.*, 625 F.2d at 570–72; *Texas Oil & Gas Corp.*, 466 F.2d at 1047–49.

Colonial argues that because as of the date of the tax lien filings (i) it possessed a perfected security interest in P & S's accounts and contract rights, and (ii) P & S's account receivable in the contested funds had come into existence, the rules governing the former situation are applicable here. Under 26 U.S.C.A. § 6323(a), a federal tax lien "shall not be valid as against any purchaser, holder of security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary."[11] In order to come within the protections of this statute, a holder of a security interest must establish four conditions: (1) that the security interest was acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss; (2) that the property to which the security interest was to attach was in existence at the time the tax lien was filed; (3) that the security interest was, at the time of the tax lien filing, protected under state law against a judgment lien arising out of an unsecured obligation; and (4) that the holder of the security interest parted with money or money's worth. 26 U.S.C.A. § 6323(h)(1).[12]

The government concedes that Colonial established three of these four elements, but challenges Colonial's assertion as to the date that P & S's account in the delay expenses came into existence.[13] According

---

**10.** *See infra* n. 20.

**11.** Subsection (f) of 26 U.S.C.A. § 6323 governs the manner and place in which notice of a tax lien must be filed.

**12.** Section 6323(h)(1) provides that:
The term 'security interest' means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judg-ment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

**13.** As the government cogently sets forth the issue in its brief:
The issue in this case is whether the delay expenses of the subcontractor [P & S] constituted an "account" to which the bank's security interest attached before ... the filing of the federal tax liens. There is no dispute that the bank held a security interest in then-existing accounts receivable of the subcontractor pur-

to the government, the P & S account for which the contested funds are proceeds only came into existence when the Navy paid Atlantic States the equitable adjustment to the prime contract in June, 1986.

### B. *Identifying the Issue: What Is an Account?*

The issue thus boils down to when P & S's account originally came into existence, or phrased another way, when did P & S first have a right to obtain the funds at issue in this case. *See* Coogan, *The Effect of the Federal Tax Lien Act of 1966 upon Security Interests Created Under the Commercial Code,* 81 Harv.L.Rev. 1369, 1383–86 (1968); Creedon, *Assignments for Security and Federal Tax Liens,* 37 Fordham L.Rev. 535, 562–63 (1969). Both parties agree that the definition of the underlying property interest is left to state law and that Alabama law is applicable in this case. *United States v. Rodgers,* 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983) ("although the definition of underlying property interests is left to state law, the consequences that attach to those interests is a matter of federal law"); *Aquilino v. United States,* 363 U.S. 509, 512–14, 80 S.Ct. 1277, 1280–81, 4 L.Ed.2d

1365 (1960) (state law controls the nature of the legal interest which the taxpayer had in the property, but federal law determines the priority of competing liens). *See also Aetna Insurance Co. v. Texas Thermal Industries,* 591 F.2d at 1038–39.

Under Alabama's version of the Uniform Commercial Code, an account is "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." 1975 Ala. Code § 7–9–106.[14] Our recent opinion in *Merchants National Bank of Mobile v. Ching,* 681 F.2d 1383 (11th Cir.1982), provides a helpful background in delineating the boundaries of what constitutes an account. In *Merchants National Bank,* as in the present case, we were confronted with the question whether certain claims by a contractor constituted an account under Alabama law for purposes of a security interest held by a bank. In finding that one claim was an account, while three others were not, we drew a distinction between a claim for payment that was specifically covered and incorporated in the contractual agreement and those claims for which no contractual provision existed. For example, we found that the contrac-

suant to the assignment (from another bank) of a security interest therein, which was perfected under Alabama law on March 25, 1982. Nor is there any dispute that the tax liens were filed after the bank's security interest (in any extant accounts receivable) had been perfected (the tax liens were filed on March 15, 1983, June 21, 1983, July 13, 1983, June 5, 1984, and June 21, 1985). Nevertheless, the fact that the bank had perfected its security interest in the subcontractor's then-existing "accounts" prior to the Government's filing of the tax liens is not dispositive of the question of the bank's entitlement to priority over the federal tax liens with regard to the "fund" at issue here. Rather, the question of priority hinges on whether that fund constitutes the proceeds of an "account" that existed in January, 1982, as contended by the bank, or that did not come into existence until June, 1986— well after the tax lien notices had been filed— as determined by the District Court.
Brief for the United States, at 18–19.

**14.** In its entirety, 1975 Ala.Code § 7–9–106 provides that:

"Account" means any right to payment for goods sold or leased or for services rendered

which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money. All rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are accounts.
This statutory definition of an account, while broader than the definition found in the 1962 version of the Uniform Commercial Code, *see* Official Comment under § 7–9–106, is not so unlimited in scope so as to include all contractual rights to receive payments; rather, by definition, it only includes those rights for payment that will arise or have already arisen from the sale or lease of goods or the rendering of services. Coogan and McDonnell, 1B *Bender's Uniform Commercial Code Service: Secured Transactions under the Uniform Commercial Code* § 15.04, at 15–17 (1988 Cum.Supp.).
Because the account in the instant case was created by performance before the relevant tax liens were filed, this change in the law is of no consequence here.

tor's claims for items not listed in the contract or for actions that were taken as a result of the owner's breach of contract did not constitute an account. *Id.*, at 1388–89. In contrast, however, we found that the contractor's claim for payment for rework caused by the owner's actions was an account because the contract authorized that the contractor "shall be entitled to an equitable adjustment in the event that rework is caused by the actions of others." *Id.*, at 1386–87. We also held that the determination of when an account comes into existence is not dependent upon whether an exact amount of payment claimed is known; instead, we determined that the relevant inquiry is whether the payment is for services rendered. *Id.*, at 1387.

Consequently, in order to determine both whether P & S had an account and when that account arose, we must turn to P & S's contractual agreement with Atlantic States.

### C. *P & S's Rights under the Subcontract*

■ In order to assess P & S's contractual rights, a brief explanation of the role of several of the contractual provisions at issue is in order. First, Section 17 of the prime contract, *see supra* n. 2, is a traditional federal contract suspension of work clause. This clause was developed to provide additional contractual remedies to contractors with the federal government by providing them with a contractual right to reimbursement for any additional expenses or losses incurred by the government's unreasonable delay. *See Merritt–Chapman & Scott Corp. v. United States*, 208 Ct.Cl. 639, 528 F.2d 1392, 1396–98 (1976) (discussing the history behind and purpose underlying the inclusion of suspension of work clauses in federal contracts). *See also* Note, *"No Damage" Clause in Construction Contracts: A Critique*, 53 Wash.L. Rev. 471, 489–90 (1978). "The suspension clause converts an action for damages into a matter properly for determination and payment under and pursuant to the contract in the form of an equitable adjust-

ment." *Cannon Construction Co. v. United States*, 162 Ct.Cl. 94, 319 F.2d 173, 179 (1963). *See Merritt–Chapman & Scott Corp. v. United States*, 194 Ct.Cl. 461, 439 F.2d 185, 192–93 (1971). In other words, the suspension of work clause obligates the federal government, having unreasonably delayed the contract, to adjust the contract price to compensate the contractor for losses incurred by the delay. Thus, in this case, once the Navy created an unreasonably delay by suspending construction work at the Oil Spill Prevention Facility, Atlantic States became contractually entitled to an adjustment for any additional costs incurred in performing the contract that resulted from the delay. *Cf. Merchants National Bank of Mobile*, 681 F.2d at 1387.

Also of relevance are two provisions in the subcontract: the "incorporation" provision and the "exculpatory clause." The subcontract between Atlantic States and P & S explicitly incorporated the terms of the general contract between Atlantic States and the Navy.[15] As the district court observed, by virtue of the incorporation provision, P & S was to be entitled to an equitable adjustment for delay expenses from Atlantic States on the same basis that Atlantic States was entitled to an equitable adjustment for delay expenses from the Navy. *See United States ex rel. Aetna Drywall Contractors, Inc. v. Aetna Casualty and Surety Co.*, 725 F.2d 650, 651 (11th Cir.1984) (in suit by subcontractor against prime contractor, subcontractor need not apportion damages on basis of whether change orders or other delays were fault of contractor or federal government where subcontract incorporated provisions of general contract between contractor and the federal government and one incorporated provision in the general contract contained equitable adjustment clause making federal government liable to contractor for any increased costs resulting from change orders); *United States ex rel. Gray–Bar Electric Co. v. J.H. Copeland & Sons Construction, Inc.*, 568 F.2d 1159, 1162 & n. 5 (5th Cir.) (same), *cert. denied*

---

15. R–1–37–9.

*sub nom. Reliance Insurance Co. v. F & D Electrical Contractors, Inc.*, 436 U.S. 957, 98 S.Ct. 3072, 57 L.Ed.2d 1123 (1978). *See also McDaniel v. Ashton–Mardian Co.*, 357 F.2d 511, 516–17 (9th Cir.1966) (where prime contract provision incorporated into subcontract allowed only limited relief not including delay damages to prime contractor from federal government for delays or changes caused by the federal government, subcontractor is not entitled to recover delay damages from prime contractor).

However, the district court found merit in the federal government's argument that the subcontract's "exculpatory" clause negated P & S's right to delay damages from Atlantic States. This clause provided that:

> Contractor shall not be liable to the Subcontractor for delay to Subcontractor's work by the act, neglect or default of the Owner, or the Architect, or by reason of fire or other casualty, or on account of riots, or of strikes, or other combined action of the workmen or others, or on account of any acts of God, or any other cause, beyond Contractor's control, or on account of any circumstances caused or contributed to by the Subcontractor; but Contractor shall cooperate with Subcontractor to enforce any just claim against the Owner or Architect for delay.

The district court reasoned that, as a result of this provision, "P & S had no right to payment for delay expenses sufficient to constitute an account prior to [Atlantic States]'s receipt of equitable adjustment

funds from the Navy in June 1986." District Court's Order, at 7.

In order to evaluate the district court's assessment of the effect of the subcontract's exculpatory clause, some background as to the clause's purpose is in order. An exculpatory clause, such as the one found here, is not an uncommon occurrence in instances in which a prime contractor with the federal government establishes a subcontractual relationship with other companies. The exculpatory clause serves the purpose of insulating the general contractor itself from the possibility of being (1) liable to the subcontractor for delay caused by the government, yet (2) unable to recover from the government. *Seger v. United States*, 199 Ct.Cl. 766, 469 F.2d 292, 300 (1972); *Blount Brothers Construction Co. v. United States*, 348 F.2d 471, 474 (1965).

In *Blount Brothers Construction Co.*, the Court of Claims addressed the function of an exculpatory provision virtually identical to the one at issue in this case.[16] At issue in the case was whether the prime contractor had standing to assert certain claims against the government on behalf of its subcontractors. The government argued that the prime contractor was precluded from bringing the action because the exculpatory clause relieved the prime contractor of any liability to its subcontractor for having incurred additional costs resulting from a hold order issued by the Navy.[17] The plaintiff countered the government's contention with the argument that the exculpatory clause related solely to breaches of contract and not to

**16.** The exculpatory provision in *Blount Brothers Construction Co.*, provided that:

> Contractor shall not be liable to the Sub–Contractor for delay to Sub-contractor's work by the act, neglect or default of the Owner, * * * or on account of any acts of God, or any other cause, beyond the Contractor's control; but Contractor will cooperate with Sub–Contractor to enforce any just claim against the Owner or Architect for delay.

348 F.2d at 472 n. 2.

**17.** The government's argument was premised upon the doctrine established in *Severin v. United States*, 99 Ct.Cl. 435 (1943), *cert. denied*, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944), which to some extent limited the ability of prime contractors to bring damages claims on

behalf of its subcontractors. As described by the Court of Claims, the *Severin* doctrine provides that:

> * * * a prime contractor may sue the Government for damages incurred by one of its subcontractors through the fault of the Government * * * only when the prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future. These are the only ways in which the damages of the subcontractor can become, in turn, the damages of the prime contractor, for which recovery may be had against the Government.

*Blount Brothers Construction Co.*, 348 F.2d at 471, *quoting J.L. Simmons Co. v. United States*, 158 Ct.Cl. 393, 397, 304 F.2d 886, 888 (1962).

claims of equitable adjustment that come within the terms of the contract. Agreeing with the plaintiff, the Court of Claims held that while the exculpatory clause as properly construed protects the contractor from being placed in a position in which it might be held liable to its subcontractor for breach of contract as a result of delays caused by the government without being able to recover from the government, "the exculpatory clause did not affect plaintiff's liability to its subcontractor insofar as *claims under the prime contract* were concerned." 348 F.2d at 474 (emphasis in original). *Accord Umpqua River Navigation Co. v. Crescent City Harbor District,* 618 F.2d 588, 594 (9th Cir.1980). In other words, notwithstanding the exculpatory clause, the prime contractor remained liable under the subcontract to its subcontractor to the same extent that the federal government was liable to the prime contractor under the prime contract.

Although the result reached in *Blount Brothers Construction Co.* has been the subject of some criticism, *see generally* Note, *Facilitating Subcontractors' Claims Against the Government through the Prime Contractor as the Real Party in Interest,* 52 Geo.Wash.L.Rev. 146 (1983), three arguments favor following its result in this case. First, the exculpatory clause also had language requiring Atlantic States to cooperate with P & S in bringing its claim for equitable adjustment.[18] This cooperation clause indicates that Atlantic States was not absolved from responsibility to P & S by virtue of the exculpatory clause; rather, Atlantic States had an obligation to go forward with P & S's claim.[19] *See Keydata Corp. v. United States,* 205 Ct.Cl. 467, 504 F.2d 1115, 1121 & n. 10 (1974). Second, we cannot ignore the fact that *Blount Brothers Construction Co.* was a part of the legal landscape at the time that

the subcontract was entered into. Given that the subcontract in this case utilizes language virtually identical to the language at issue in *Blount Brothers Construction Co.,* we believe that, at least in the absence of any evidence of intent to the contrary, we would be remiss in not construing the subcontract's provisions in a manner consistent with what must been the understanding of the participants to the subcontract at its time of formation. And finally, this interpretation of the combined effect of the contract's incorporation provision and exculpatory clause—i.e., that the prime contractor is liable to the subcontractor for an equitable adjustment to the contract for additional performance costs incurred because of the delay to the extent that the federal government is liable to the prime contractor—comports with a common-sense reading of the contract as a whole.

### D. *When P & S's Account Arose*

■ Our conclusion that the district court erred in construing the function of the exculpatory clause does not, in and of itself, however, answer the ultimate question: namely, whether the contested funds in this case constituted an "account" to which Colonial had a protected security interest under § 6323.

As discussed in the previous section, the prime contract between Atlantic States and the Navy explicitly provided Atlantic States with a contractual right to receive an adjustment for "any increase in the cost of performance" of the contract caused by the Navy's unreasonable suspension or delay. Via the incorporation provision, P & S possessed the same right to an adjustment as did Atlantic States, and this right was not impaired by the exculpatory clause found in the subcontract. Consequently, the

---

**18.** This clause was necessary in light of Supreme Court rulings precluding a subcontractor from recovering claims against the United States in the absence of an express or implied contract between the subcontractor and the federal government. *See, e.g., United States v. Blair,* 321 U.S. 730, 737, 64 S.Ct. 820, 824, 88 L.Ed. 1039 (1944); *Merritt v. United States,* 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925).

**19.** Indeed, at oral argument, the government conceded that P & S had an enforceable contractual right to Atlantic State's cooperation in seeking and obtaining an equitable adjustment to the contract from the Navy.

funds at issue represent payments to which P & S is contractually entitled for having incurred additional expenses in completing its contract with Atlantic States—that is, the funds represent a P & S account.

Turning finally to the ultimate issue, we conclude that there is little question that P & S's account came into existence prior to government's filing of the tax liens. An unreasonable delay resulted from the Navy's suspension of work directive, which was in effect from April 2, 1981 to January 11, 1982. Once the suspension of work directive was lifted, P & S continued to perform its contractual obligations under the subcontract until March 4, 1982, when it had completed its part of the project. As of that time, P & S was entitled to an adjustment in its contractual payments to offset the additional costs of performance. Thus, the very latest that it could have been said that P & S's account arose is March 4, 1982, even though the amount of money to which P & S was entitled had not yet been fixed. *Merchants National Bank of Mobile v. Ching,* 681 F.2d at 1387.

## III. CONCLUSION

■ For the reasons stated, the P & S account was in existence at least by March 4, 1982. Colonial's security interest was perfected on March 25, 1982. The federal government's first tax lien against P & S was not filed until March 15, 1983, almost a year after Colonial had a perfected security interest in the existing P & S account. Thus, under § 6323(a) and § 6323(h)(1) of the Internal Revenue Code, Colonial's security interest takes precedence over the tax lien.[20] *See, e.g., Trust Co. of Columbia v. United States,* 735 F.2d 447, 448 (11th Cir.1984); *Aetna Insurance Co. v. Texas Thermal Industries,* 591 F.2d 1035 (5th Cir.1979) (per curiam).

Accordingly, the district court's grant of summary judgment to the federal government is REVERSED, and this case is REMANDED to the district court with in-

---

**20.** We note that the government has not argued in this case that its tax lien takes priority over Colonial's security interest because the account attached by the security interest did not represent a liquidated sum until such time as an agreement was reached with the Navy as to the sum of the equitable adjustment due to P & S. In other words, the government has not contended that, while the calculation of an exact sum due may not be relevant to the determination as to when an account exists as a matter of state law, such a calculation is necessary under federal law if Colonial's security interest is to take priority over the tax liens. *See United States v. Rodgers,* 461 U.S. at 683, 103 S.Ct. at 2137 (although definition of property interest is matter of state law, the consequences that attach to those interests is determined by federal law). Such an argument, of course, would be an argument that the federal tax lien should take priority over Colonial's security interest because the latter was not sufficiently choate at the time the government's lien attached. *See, e.g., United States v. Pioneer American Insurance Co.,* 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963); *United States v. R.F. Ball Construction Co.,* 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510 (1958) (per curiam).

We think the government's decision not to argue that the choateness doctrine should be applied in this case was sound. As an initial observation, it is not clear after *Crest Finance Co. v. United States,* 368 U.S. 347, 82 S.Ct. 384, 7 L.Ed.2d 342 (1961) (per curiam), *rev'g* 291 F.2d 1 (7th Cir.1961), that the security interest at issue was not sufficiently choate under federal law so as to be superior to the subsequent tax liens. We need not pursue this rather ephemeral inquiry, however, in light of Congress's enactment of the Federal Tax Lien Act of 1966. Although some courts, particularly the Seventh Circuit, have applied the choateness test in addition to the tests formulated by the Federal Tax Lien Act, *see, e.g., J.D. Court, Inc. v. United States,* 712 F.2d 258, 261–64 (7th Cir.1983), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1708, 80 L.Ed.2d 182 (1984); *Sgro v. United States,* 609 F.2d 1259, 1261 (7th Cir.1979); *see generally* Note, *The Continuing Use of the Choateness Doctrine in Determining the Priority of Federal Tax Liens,* 12 Tex.Tech.L.Rev. 959, 975–978 (1981) (discussing other federal cases), and there exists *dicta* in one case in this circuit to similar effect, *Texas Oil & Gas Corp. v. United States,* 466 F.2d at 1053, our case law has clearly established that the choateness doctrine has "been supplanted by the provisions of § 6323 with respect to tax lien priority questions as to which that statute provides an unambiguous answer." *Aetna Insurance Co.,* 591 F.2d at 1038. *See also Rice Investment Co.,* 625 F.2d at 571. *Accord State Bank of Fraser v. United States,* 861 F.2d 954 (6th Cir. 1988); *United States v. Bell Credit Union,* 860 F.2d 365, 371 (10th Cir.1988). Thus, as the government implicitly recognized, notions of choateness are irrelevant when, as here, the determination of relative priority between a federal tax lien and a security interest created by contract can be determined by looking to the Federal Tax Lien Act.

structions that judgment be entered in favor of Colonial.