UNITED STATES of America, Plaintiff,

v.

G & T ENTERPRISES, L.C., d/b/a Papa's American Cafe, Defendant.

No. C 96–3053–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Sept. 24, 1997.

Nanci S. Bramson, Trial Attorney, U.S. Dept. of Justice, Tax Div., for U.S.

James P. McGuire, Mason City, IA, for G & T Enterprises.

## MEMORANDUM OPINION AND ORDER REGARDING TRIAL ON THE MERITS

ZOSS, United States Magistrate Judge.

### I. INTRODUCTION

On June 10, 1996, the United States filed a civil complaint against the defendant, G & T Enterprises, alleging failure to surrender to the Internal Revenue Service property in G & T's possession belonging to delinquent taxpayers. A bench trial commenced on August 13, 1997. Trial Attorney Nanci S. Bramson, U.S. Department of Justice (Tax Division), appeared on behalf of the United States. Attorney James P. McGuire appeared on behalf of the defendant, G & T Enterprises. The court took the case under advisement following the bench trial and considered the parties' oral arguments and briefs, and the testimony of the witnesses. Now, being fully advised of the premises, the court renders its decision.

### II. FINDINGS OF FACT

In the mid–1980s, Thomas ("Thomas Sr.") and Kathryn Barlas ("the Barlases" or "the taxpayers") owned several parcels of real estate in Mason City, Iowa. On August 29, 1985, they consolidated several notes and mortgages at First Interstate Bank of Mason City (later the Boatmen's Bank of North Iowa) ("the Bank") into a single note in the amount of $853,163.38, secured by a mortgage on three parcels in Mason City. The note was originally for a three-year term, but was extended several times, with the last extension agreement between the Bank and the Barlases dated September 5, 1991. Un-

der the terms of this extension agreement, the principal balance of $472,017.95 was payable in monthly installments of $12,250, with the remaining balance due and payable on September 5, 1994. The real estate mortgage provided the Bank with a security interest in the three parcels "together with ... the rents, issues, uses, profits and income therefrom...."

On May 12, 1987, the Barlases, as "Assignor," and the Bank, as "Assignee," entered into an Assignment of Leases and Rents (the "Assignment"). (*See* Ex. A, Assignment of Leases and Rents [hereinafter Assignment].) The Assignment provided that the assignor—

> does hereby sell, transfer, and assign to said Assignee, its successors and assigns, all of the right, title, and interest of Assignor in and to that particular lease between Assignor as lessor and Italiano Ltd.[1] as lessee ... TOGETHER with all rents, issues, profits, revenues, rights and benefits arising from any said leases and tenancies and any and all extensions, modifications and renewals thereof and replacements therefor, and together with all rents, issues, profits, revenues, rights and benefits from, or for the use and occupancy of the real estate herein described....

The Assignment then stated that it—

> is given as security for the payment of and the performance of all covenants and agreements of Assignor in that certain note (and any modifications of or replacements for said note) dated August 29, 1985 and made and delivered to Assignee for the sum of [$]853,163.38, and all other indebtedness of Assignor due Assignee whether now existing or hereinafter incurred. The term of this Assignment shall be until all indebtedness of Assignor to Assignee is paid in full and satisfied, at which time this Agreement is to be fully satisfied, cancelled and released.

The Assignment then recited as follows:

> It is understood and agreed between Assignor and Assignee herein, that until the occurrence of any act or omission which is determined by Assignee in its sole discretion to constitute a default in the covenants, terms or conditions of the note or this Assignment, the rents, issues, profits, revenues, rights and benefits as they become due may be paid to Assignor to retain, use, and enjoy the same. After the occurrence of a default as aforesaid, Assignee may enforce this Assignment by notifying Assignor by regular mail sent to the address hereinafter prescribed for sending notices. Whereupon, Assignee may direct any or all of the tenants of the real estate herein described to pay to Assignee, its agents or attorneys, such rents, issues, profits, revenues, rights and benefits as may now be due or shall hereinafter become due, and Assignee may collect the same. The affidavit or written statement of an officer, agent or attorney of Assignee stating that there has been a default shall constitute conclusive evidence thereof, and any tenant or other person is authorized and directed to rely thereon without liability for the determination of the actual existence of any default under the note or this Assignment and Assignor shall have no recourse against any tenant for rents paid to Assignee.

> After mailing notice to Assignor as aforesaid, Assignee may, with or without entry upon the real estate herein described, at its option, cancel all leases and take over and assume the management, operation and maintenance of the real estate herein described and perform all acts necessary and proper and expend such sums out of the amounts collected as may be needful in connection therewith, in the same manner and to the same extent as Assignor might do.

The Assignment was signed by the Barlases, and by a representative of Italiano Ltd., who agreed to the following:

> The undersigned, Italiano Ltd., Lessee, in the lease referred to in the above Assignment, hereby accepts the terms thereof as they apply to the tenancy, acknowledges receipt of a copy of said Assignment, and agrees that all notices to be given to Lessor under said Lease shall also be given to assignee, and that Lessee will not assign

---

1. Italiano Ltd. was a tenant on one of the three parcels.

or transfer its interest in said lease without the prior written consent of assignee.

Notwithstanding the detailed requirements of the Assignment, the Barlases and their banker, Larry Gray, immediately implemented the assignment of rent without any written notice or formality. Gray arranged for Italiano Ltd. to begin making rent payments directly to the Bank. The Bank accepted these rent payments and applied them to the Barlases' note. On occasion, Italiano Ltd. was delinquent in its payments, and Gray would go to Italiano to collect the rent in person. The Bank and the Barlases also agreed that the Bank would collect rent under the Assignment from the tenants of the two other parcels, Pheasant Run[2] and The Back 40, and the Bank did so. Rent payments by these tenants were sent to the Bank, where they were applied to the Barlases' note.

In the early 1990s, the Barlases encountered serious problems with the Internal Revenue Service ("the IRS"). These problems resulted in the filing of federal tax liens against the Barlases totaling in excess of $1 million. The liens were filed with the Cerro Gordo County recorder between March 22, 1993, and July 16, 1993.

In the summer of 1993, two of the Barlases' children, George Barlas and Thomas Barlas, Jr. ("Tom Jr."), were forced by the family's financial difficulties to leave college and return to the Mason City area. George and Tom Jr. decided to open a new restaurant in Mason City, and asked their father to lease them one of his properties. Thomas Sr. agreed to lease them one of the parcels mortgaged to the Bank. George and Tom Jr. began looking for financing. After several failures, they convinced a banker in Clear Lake to lend them $50,000 to start their restaurant. George and Tom Jr. jointly borrowed the $50,000, and persuaded a friend, Douglas Brown, to contribute an additional $25,000 to start the business. With this $75,000, and an additional $75,000 they scraped together, George, Tom Jr. and Douglas

Brown formed G & T Enterprises, L.C. ("G & T"), as equal shareholders.

When George and Tom Jr. met with their father to discuss the terms of the proposed lease, Thomas Sr. told them that the lease would have to be for $3,000 per month so that the Barlases would be able to make their $12,250 monthly payments on the mortgage.[3] Thomas Sr. also told his sons that the rent payments would go directly to the Bank, and that none of the money would be retained by him.

On August 15, 1993, G & T entered into a lease with the Barlases for the lease of 2960—4th Street, SW, Mason City, Iowa. Paragraph 5 of the lease agreement provided:

> QUIET ENJOYMENT. Landlord covenants that its estate in said premises is fee owner and that the Tenant on paying the rent herein reserved and performing all the agreements by the Tenant to be performed as provided in this lease, shall and may peaceably have, hold and enjoy the demised premises for the term of this lease free from molestation, eviction or disturbance by the Landlord or any other persons or legal entity whatsoever.
>
> Landlord shall have the right to mortgage all of its right, title and interest in said premises at any time without notice, subject to this lease.

The lease between the Barlases and G & T provided for monthly rental payments of $3,000, with the first payment due upon the execution of the lease, and subsequent payments due on the 15th day of each month thereafter. In early September 1993, G & T opened for business as "Papa's American Cafe," a family-oriented sports bar and grill. The restaurant was an immediate success, but bad news loomed on the horizon.

On October 2, 1993, G & T gave Thomas Sr. the first and only rent check under the lease, a check for $6,000 to cover the August and September rent payments. Tom Jr. wrote the check on the "Papa's American

---

**2.** It appears that Pheasant Run was actually purchasing one of the parcels from the Barlases under a real estate contract. The contract was forfeited by the Barlases in early 1994.

**3.** The remainder of the mortgage payment was to be provided by payments from the two other tenants, Pheasant Run and The Back 40.

Cafe" account opened by G & T at Boatmen's Bank of North Iowa in Mason City.[4] The check was payable to Thomas Barlas Sr. as payee. In the memo section of the check, Tom Jr. wrote "for rent." Tom Jr. gave the check to Thomas Sr., who gave it to his wife, who in turn wrote the words "apply to loan Boatmans" following the word "rent" in the memo section of the check. Without endorsing the check, Kathryn or Thomas Sr. took the check to Boatmen's Bank, where it was stamped with the following:

CREDITED TO THE ACCOUNT OF
The Within Named Payee
In Accordance With Payee Instructions
Absence of Endorsement Guaranteed
BOATMEN'S BANK OF NORTH IOWA
72–2176

The check was then applied directly to the Barlases' mortgage loan at the Bank.

A notice of levy was served on G & T on October 21, 1993. The levy required G & T to turn over to the IRS any property or rights to property belonging to the Barlases in G & T's possession or which G & T was obligated to pay to the Barlases. On the date of the levy, G & T owed the Barlases the October 15, 1993, rent payment of $3,000. A Final Demand relating to the October 21, 1993 levy was served on G & T on November 29, 1993. Upon receiving the notice of levy, George and Tom Jr. consulted with their lawyers, who advised them to stop making rent payments. George and Tom Jr. then met with Thomas Sr. and told him that, on the advice of their lawyers, they would be making no further rent payments.

As word of the levy spread through the community, Papa's American Cafe began to encounter difficulties. The restaurant received a number of calls from customers asking if the restaurant was going to remain in business. G & T began to experience cash flow problems as the public hastened to use up Papa's American Cafe gift certificates. George and Tom Jr. worried that, as a result of the tax levy, they would lose their $150,000

investment in remodeling the property. At about the same time, The Back 40 and Pheasant Run fell upon hard times and also stopped their rent payments. By December 1993, the Barlases were unable to make their mortgage payments. On July 27, 1994, the Bank filed a foreclosure petition in the Iowa District Court for Cerro Gordo County, naming the United States of America as one of the defendants because of its federal tax liens.

The petition stated:

¶ 10. Defendant, United States of America acting through the Department of the Treasury, Internal Revenue Service, claims or may claim an interest in the property being foreclosed hereby pursuant to the following:

a. Notice of Federal Tax Lien ...; said Notice of Federal Tax Lien was filed against Thomas G. and Kathryn S. Barlas ... by the Internal Revenue Office ...; said Notice of Federal Tax Lien was dated September 1, 1993, and was filed September 7, 1993, in ... the records of the Cerro Gordo County Recorder.

b. Notice of Federal Tax Lien ...; said Notice of Federal Tax Lien was filed against Thomas G. and Kathryn S. Barlas ... by the Internal Revenue Office ...; said Notice of Federal Tax Lien was dated September 21, 1993, and was filed September 27, 1993, in ... the records of the Cerro Gordo County Recorder.

c. Notice of Federal Tax Lien ...; said Notice of Federal Tax Lien was filed against Thomas G. and Kathryn S. Barlas ... by the Internal Revenue Office ...; said Notice of Federal Tax Lien was dated February 9, 1994, and was filed February 14, 1994, in ... the records of the Cerro Gordo County Recorder.

Any such interest of Defendant, United States of America, acting through the Department of the Treasury, Internal Revenue Service, is junior and inferior to the

---

4. Boatmen's Bank was the successor of First Interstate Bank of Mason City.

lien of Plaintiff's Mortgage and Assignment of Purchase Agreement.

(Def.'s Ex. C, Pet. [of Boatmen's Bank of North Iowa].)

The answer of the United States stated:

¶ 2. Defendant admits to paragraph 10 and states that it does have an interest in the subject real property by virtue of a valid federal tax lien. In further response to paragraph 10, this defendant denies its claim is junior or inferior to plaintiff's.

(Def.'s Ex. J, Ans. of Def. United States of America.)

On September 26, 1994, the IRS seized the G & T restaurant property by posting the seizure of the property on the windows of Papa's American Cafe, although the restaurant remained in business. The Iowa District Court for Cerro Gordo County entered a decree of foreclosure in favor of the Bank on October 31, 1994. The decree stated:

¶ 2. That the lien of the encumbrances given by the Barlas', are hereby established, confirmed, and foreclosed as valid liens for the security of the amount of the judgment hereinbefore entered by this Court in favor of Plaintiff and said liens are valid liens against the following described real estate. . . . And said liens are senior and superior to all rights, titles, interests, liens or claims of the Defendants hereto and is foreclosed against all of them.

\* \* \* \* \* \*

¶ 4. That the period of redemption from the Sheriff's sale ordered herein shall be a period of six (6) months; that the Defendant, United States of America acting through the Department of the Treasury, Internal Revenue Service shall have all rights of redemption granted by 28 U.S.C. § 2410.

(Def.'s Ex. H, Decree at 4–6.)

No receiver was appointed, and no rents were collected from G & T during the foreclosure action. Pursuant to the decree, on December 20, 1994, the sheriff of Cerro Gordo County sold all interests held by the Barlases in the real property to the Bank. The Bank bid in the full amount of their debt at the foreclosure sale. One of the parcels was 2960—4th Street, SW, Mason City, Iowa, the site of Papa's American Cafe.

A second notice of levy was served on G & T on January 9, 1995. The levy again required G & T to turn over to the IRS any property or rights to property belonging to the Barlases in G & T's possession or which G & T was obligated to pay to the Barlases. From the date of the October 21, 1993, levy to the January 9, 1995, levy, G & T owed additional rent for November 15, 1993, through September 15, 1994,[5] totaling $33,-000. A Final Demand relating to the January 9, 1995 levy was served on G & T on January 25, 1995.

On June 10, 1996, the United States commenced this action under I.R.C. § 6332.[6]

### III. LEGAL ANALYSIS

G & T contends that they were not in possession of the Barlases' property at the time of the tax levies, arguing that the rents they owed on the dates of the levies were the property of the Bank and not the Barlases. They further claim that they were therefore not required to honor the IRS levies in 1993 and 1995. The court disagrees.

There is no question that the Bank held a lien on the rents at the time of the two IRS levies. The Bank obtained this lien when the rents were pledged as collateral in the granting clause of the mortgage executed by the Barlases on August 29, 1985. Furthermore, the Bank received an assignment of the rents "as security" for payment of the mortgage in a separate Assignment of Leases and Rents executed by the Barlases on May 12, 1987. Thus, on the dates of the IRS liens in 1993,

---

**5.** This was the last date a rental payment was due from G & T before the foreclosure decree was entered.

**6.** Section 6332 provides:

Any person who fails or refuses to surrender any property or rights to property, subject to

levy, upon demand by the Secretary, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered . . . together with . . . interest. . . .

I.R.C. § 6332(d)(1).

and on the dates of the IRS levies in 1993 and 1995, the Bank had a superior lien on all the rents due on the property. *See Federal Land Bank of Omaha v. Lower,* 421 N.W.2d 126, 129 (Iowa 1988) (holding "that the bank's lien on rents from the encumbered land was effective from the date of the execution of the mortgage and not from the date on which the appointment of a receiver was requested"); *Presidential Realty Corp. v. Bridgewood Realty Investors,* 498 N.W.2d 694, 697 (Iowa 1993) (holding that "[a] mortgagee has a lien on rents from the date of execution of the mortgage if the mortgage conveys the rents in the granting clause rather than merely pledging them as collateral or as additional security in the event of a default").

 The fact that the Bank had a prior lien on rents does not, however, excuse G & T from their failure to make payment on the IRS levies. G & T may only defend their failure to honor the levies in one of two ways: either assert that G & T was not in possession of the taxpayer's property at the time of the levies or claim that the property was subject to a prior judicial attachment or execution. *United States v. National Bank of Commerce,* 472 U.S. 713, 721–722, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985); *see also State Bank of Fraser v. United States,* 861 F.2d 954, 962 (6th Cir.1988) (holding that "the claim of a priority interest is not a proper defense to a levy enforcement action[; r]ather, such a defense should be raised in a wrongful levy action" under I.R.C. § 7426(a)(1)[7]); *United States v. Citizens & Southern Nat'l Bank,* 538 F.2d 1101, 1106 (5th Cir.1976) (finding that "the claim of a prior lien may not be interposed as a defense to an action to enforce a tax levy"), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977); *United States v. Sterling Nat'l Bank & Trust Co. of New York,* 494 F.2d 919, 921 (2d Cir.1974) (stating that "a person served with a tax levy has only two defenses for a failure to comply with the demand, which are either that the person is not in possession of the taxpayer's property or the property is subject to a prior judicial attachment or execution," and that lien priority is therefore not a defense); *see also* I.R.C. § 6332(a) ("any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights (or discharge such obligation) to the Secretary, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process"). Since the property in this case, i.e., the rents, was not subject to a prior judicial attachment or execution, the court may only excuse G & T from making payment on the levies if, at the time the levies were served, G & T was not in possession of the taxpayers' property. Thus, to defeat the IRS's claims, G & T must show that they did not owe the Barlases any rent on the dates of the two levies.

 The parties have stipulated that G & T owed rent of $3,000 on October 21, 1993, the date of the first IRS levy, and rent of $33,000 on January 9, 1995, the date of the second IRS levy. The sole question facing this court is whether on those dates G & T owed the money to the Barlases or, by virtue of the mortgage and the Assignment, G & T owed the money to the Bank. In order to determine to whom G & T owed the money, the court must first consider the nature of the Assignment. To determine the extent to which a party has property or rights to property to which a federal tax lien could attach, the court must turn to state law, which controls the nature of the legal interest in the property purportedly subject to the tax lien. *National Bank of Commerce,* 472 U.S. at 722, 105 S.Ct. at 2925; *accord Tony Thornton Auction Serv. Inc. v. United States,* 791 F.2d 635, 637 (8th Cir.1986); *see also Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state

---

7. I.R.C. § 7426 governs actions for wrongful levy and provides that:

 [i]f a levy has been made on property or property has been sold pursuant to a levy, any person . . . who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. . . .

I.R.C. § 7426(a)(1).

law."). Once the tax lien attaches to the state-created interest in property or property rights, federal law dictates the tax consequences and the priority of competing liens against the property or rights. *National Bank of Commerce*, 472 U.S. at 722, 105 S.Ct. at 2925; *Tony Thornton Auction Service*, 791 F.2d at 637; *see also In re Guardian Realty Group, L.L. C.*, 205 B.R. 1, 4 (Bankr.D.D.C.1997) ("The classification question [of an assignment as absolute or as security] is a matter of federal law applied to rights created by state law.").

▆▆▆ Under Iowa law, to determine the nature of an assignment the court must take into account the intent of the parties. *Padzensky v. Kinzenbaw*, 343 N.W.2d 467, 471 (Iowa 1984). "Unless a contrary intent is manifest or inferable, an assignment transfers to the assignee the assignor's entire interest or rights in the property." *Id.* (citing *Broyles v. Iowa Dept. of Social Services*, 305 N.W.2d 718, 721 (Iowa 1981); *Kintzel v. Wheatland Mutual Ins. Ass'n*, 203 N.W.2d 799, 806 (Iowa 1973)). According to the *Padzensky* court, "[t]he intentions of the parties may be proved by direct evidence such as testimony, or they may be inferred from the circumstances surrounding the entire transaction, including the parties' conduct." *Padzensky*, 343 N.W.2d at 471 (citations omitted). The parties may use parol evidence to show that an assignment that appears absolute on its face was actually intended as security. *Padzensky*, 343 N.W.2d at 471.

▆▆▆ The Assignment executed by the Barlases and the Bank stated, on its face, that it was "given as security for the payment of and the performance of all covenants and agreements of Assignor." According to the court in *Guardian Realty*, "[w]hether in a 'title state' or a 'lien state,'[8] a mortgagee's interest in rents to secure its claim is that of a lienor against, not an owner of, the rents." *Guardian Realty*, 205 B.R. at 5. Neverthe-

less, G & T argues that in this situation the Assignment was an absolute assignment, and was not for purposes of security.[9] For the following reasons the court is not persuaded by this argument.

The written terms of the Assignment provided that the Bank could, after a default on the mortgage note, notify the Barlases that it was enforcing the Assignment. Then, by sending the Barlases' tenants an affidavit or written statement certifying that the Barlases had defaulted of their note, the Bank could direct the tenants to pay their rent to the Bank. None of these steps was ever taken by the Bank with respect to the G & T property.

G & T points out that beginning in 1987 the Bank began collecting rents on the Barlases' properties and applying those rents to the mortgage note. G & T argues that this fact proves that the right to receive the rents from the Barlases' properties had been assigned absolutely to the Bank. The court disagrees. There is no evidence even to suggest that the parties intended this arrangement to be an absolute assignment of the Barlases' rights to receive rents from their properties. The Assignment itself provided that "[t]he term of this Assignment shall be until all indebtedness of Assignor to Assignee is paid in full and satisfied, *at which time this Agreement is to be fully satisfied, cancelled and released.*" (Ex. A, Assignment (emphasis supplied).) In fact, according to the written terms of the Assignment, the parties contemplated that it would expire upon the payment of the mortgage note and the release of the mortgage. Furthermore, the Barlases were not even in default on their mortgage note when the Bank began collecting rents for the Barlases. This arrangement appears to have been simply a convenient method for the Bank to ensure that all rent payments on the mortgaged properties were received by the Bank

---

8. Iowa adheres to the lien theory of mortgages. *See* Iowa Code Ann. § 557.14 ("In the absence of stipulations to the contrary, the mortgagor of real estate retains the legal title and right of possession thereto."). By contrast, under the title theory of mortgages, "a mortgagee ... is deemed to have taken legal title upon the execution of a mortgage on real property." *See, e.g.,*

*Red Rooster Constr. Co. v. River Assoc. Inc.*, 224 Conn. 563, 620 A.2d 118, 122 (1993).

9. *See* discussion of assignments of rents in John J. Rapisardi & Elliot L. Hurwitz, *The Mortgagee's Right to Rents After Default: An Unsettled Controversy*, 6 J. Bankr.L. & Prac. 331 (1997).

and applied to the mortgage note. Moreover, even the informal rent-collection arrangement between the Barlases and the Bank was never implemented for the G & T lease. G & T made their first and only rental payment directly to the Barlases in the form of a check payable to Thomas Sr.

In *C & M Developers, Inc. v. Berbiglia, Inc.*, 585 S.W.2d 176 (Mo.App.1979), a Missouri court construed an assignment with language remarkably similar to that of the assignment in the instant case. The court prefaced its analysis by noting that it is a "fundamental proposition that future rents can be assigned as collateral security for another debt." It then held that the assignment in question was not absolute but for purposes of security, noting that the assignment stated that—

[1. The Bank] desires further security for the payment of the principal of said loan and interest thereon and for the performance by C & M [the assignor] of all the terms and conditions and agreements on its part to be performed and which are contained in the aforementioned Promissory Note and Deed of Trust....

[2.] This assignment is to remain in full force and effect and to be binding upon the grantees, transferees, and assigns of C & M until the indebtedness secured by the said deed of trust above described shall be fully paid....

[3.] It is further understood and agreed by C & M that while this assignment is in force, C & M shall not be relieved from the performance of any of the obligations of the ownership of said Leasehold Estate....

*Id.* at 181–82.

Like the *C & M Developers* assignment, the Barlases' assignment recites that it "is given as security," that "[t]he term of this Assignment shall be until all indebtedness of Assignor to Assignee is paid in full and satisfied," and that "Assignor covenants with Assignee faithfully to observe and perform all of the obligations and agreements imposed upon Assignor as lessor or landlord in any

leases or tenancies and Assignee will not be deemed in any manner to have assumed the same." (*See* Ex. A, Assignment.)

In construing an assignment of rents to determine whether the rents constituted property of the bankruptcy estate, the court in *Guardian Realty* was presented with mortgage that recited, on its face, that it included an absolute assignment of rents due on the property. The court noted that several provisions in the mortgage contradicted the absolute assignment language, and in fact presented "the classic signs of a security interest ... the intended substance of [which] was only that of a security interest." *Guardian Realty*, 205 B.R. at 5. The contradictory provisions of the assignment included the following:

[1.] "[T]he Borrower hereby grants ... to the Lender a security interest in all right, title, and interest ... in and to any leases of the Property."...

[2. T]he lender only has the right to collect the rents "upon occurrence of an event of default hereunder."...

[3. D]efault alone is insufficient to permit the lender to collect rents. The right to receive rents arises only after the lender has given notice of default, the borrower has failed to cure within thirty days, and the lender has entered upon the property....

[4. T]he lender's right to receive rents completely terminates upon payment of the loan in full by the borrower.

*Id.* at 4–5 (citing to the assignment; citations omitted). The court held that "[a]s long as the mortgagor is entitled to the rents upon paying the mortgage debt, a security interest has been given, not a transfer of ownership." *Id.* at 5.

Again, the language of this assignment closely resembles the language of the Assignment in the instant case. Like the *Guardian Realty* assignment, the Barlases' assignment was "given as security." Also like the *Guardian Realty* assignment, the Bank had to await a default in order to enforce its right to collect the rents.[10] Similarly, default was

---

10. The Assignment provides:

It is understood and agreed between Assignor and Assignee herein, that *until the occurrence*

a necessary, but not sufficient, condition to permit the Bank to collect rents—other steps were required.[11] Finally, the Bank's right to the rents would terminate once the Barlases repaid the note in full. *See also In re Carmania Corp. N.V.*, 154 B.R. 160 (S.D.N.Y. 1993) (holding that "[t]he assignment of rents clause at issue here constituted a pledge of rents as security in case of default on the mortgage and not an absolute assignment, because the rents are assigned as 'further security,' and the Bank's right to collect them is triggered only 'upon the occurrence of a default").

For the reasons discussed above, the court finds that the Assignment in this case was for security purposes and not absolute. G & T leased the property and failed to turn over rent monies after the IRS filed its tax liens. Thus, G & T withheld the rental payments which were subject to the tax liens. As a consequence, G & T is liable under I.R.C. § 6332(d)(1) for failure to honor the levies.

■ G & T also contends that they were not in possession of the Barlases' property at the time of the tax levies because the decree in the Bank's foreclosure action terminated the Barlases' rights in rental income from the property. The only case cited by G & T in support of this argument is *Otis Elevator Co. v. Mid–America Realty Investors*, 206 Mich.App. 710, 522 N.W.2d 732 (1994). This case deals with a specific application of a Michigan statute to Michigan property, which does not help G & T in the instant case.

The first levy was served before the foreclosure action was even filed. G & T had an obligation to honor the levy when it was served. G & T cannot excuse their failure to respond to the levy by pointing to the decree. The second levy was served after the entry of the foreclosure decree, so the decree arguably could have affected the IRS's right to enforce the levy. However, the Bank did not elect to collect the rents due on the mortgaged property as part of the foreclosure action. Therefore, the foreclosure decree had no effect on G & T's obligation to pay rent to the Barlases or on G & T's obligation to respond to the IRS's levy.

■■ G & T further contends that the IRS's second levy was barred by the doctrine of issue preclusion or collateral estoppel. G & T claims that the language in the decree declaring the IRS's liens on the real estate inferior to the Bank's lien precludes the IRS from asserting a lien on the rents. Again, this is not the case. Issue preclusion (collateral estoppel) requires a prior adjudication on the issue in question.[12] The foreclosure

---

*of any act or omission which is determined by Assignee in its sole discretion to constitute a default in the covenants, terms or conditions of the note or this Assignment, the rents, issues, profits, revenues, rights and benefits as they become due may be paid to Assignor to retain, use, and enjoy the same.*

(Def.'s Ex. A, Assignment (emphasis added).)

11. For example, the Assignment provides:

· *After the occurrence of a default as aforesaid, Assignee may enforce this Assignment by notifying Assignor.... Whereupon, Assignee may direct any or all of the tenants ... to pay to Assignee ... such rents ... and Assignee may collect the same.... After mailing notice to Assignor as aforesaid, Assignee may, with or without entry upon the real estate herein described, at its option, cancel all leases and take over and assume the management, operation and maintenance of the real estate ....*

(*Id.*)

12. *In Environmental Dynamics, Inc. v. Robert Tyer and Assoc., Inc.*, 929 F.Supp. 1212 (N.D.Iowa 1996) (citing *United States v. Gurley*, 43 F.3d 1188 (8th Cir.1994), *cert. denied*, —— U.S.

——, 116 S.Ct. 73, 133 L.Ed.2d 33 (1995)), the district court discussed the Eighth Circuit's explanation of the requirements of collateral estoppel or issue preclusion:

> Under the doctrine of collateral estoppel, which also is known as issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana [v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)]. The appellants were entitled to rely on collateral estoppel in this case if "(1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue." *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 356 (8th Cir.1984) (quoting *Oldham v. Pritchett*, 599 F.2d 274, 279 (8th Cir.1979)), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985).

action adjudicated lien priorities with respect to the real estate, but not with respect to the rents due on the real estate. Since the competing claims to the rents by G & T, the Bank, and the IRS were not adjudicated in the foreclosure action, issue preclusion does not arise.

 Finally, G & T asserts that the Barlases violated the terms of the lease agreement between G & T and the Barlases, because, by failing to pay their taxes, the Barlases permitted the IRS to interfere with G & T's business, thus breaching the covenant of quiet enjoyment.[13] G & T also asserts that they suffered business losses as a result of the tax levies, which they claim they should be entitled to offset against rental payments owing to the taxpayers.

G & T presented no evidence at trial to support their claim that the Barlases breached the quiet enjoyment provision of the lease. "It is generally recognized that an eviction is necessary to constitute a breach of warranty of title or for quiet enjoyment. But there need not be an actual expulsion of the grantee. A constructive eviction is sufficient." *Kendall v. Lowther*, 356 N.W.2d 181, 190 (Iowa 1984) (quoting *Eggers v. Mitchem*, 240 Iowa 1199, 38 N.W.2d 591, 592 (1949)) (citations omitted). Not only was G & T not evicted, either actually or constructively, but they continued to occupy the premises through the foreclosure sale and beyond. As for the claim of offset, at most the evidence indicated that as a result of the IRS levy, G & T had some temporary business difficulties. There was no evidence either that these difficulties cost G & T any profits or, if they did, of the amount of the damages suffered by G & T as a result of the IRS levy. The evidence offered at trial was simply insufficient to show that G & T was entitled to an offset.

*Environmental Dynamics,* 929 F.Supp. at 1245–46 (citing *Gurley,* 43 F.3d at 1197–98; *see also Plough v. West Des Moines Community Sch. Dist.,* 70 F.3d 512, 516 (8th Cir.1995) (identical factors required in "issue preclusion" analysis under Iowa law)).

13. *See* Lease Agreement ¶ 5 *supra* pp. 5–6.

## IV. CONCLUSION

When G & T stopped making rental payments due under their lease, they retained for themselves property rightfully belonging to their landlord, the Barlases. The rent remained the rightful property of the Barlases on the dates of the two IRS levies. Upon service of the levies, G & T had a duty to turn the rental payments over to the IRS. Because G & T failed to do so, they became liable to the IRS for the amount of the unpaid rent. Therefore, the IRS is entitled to judgment against G & T in the amount of $36,000, plus statutory interest.

**IT IS SO ORDERED.**